## TRAVELERS PROTECTIVE ASSOCIATION OF AMERICA *v.* PRINSEN.

No. 429.   Argued February 9, 1934.—Decided March 5, 1934.

*Mr. Emmett M. Bagley,* with whom *Mr. Paul H. Ray* was on the brief, for petitioner.

*Mr. Joseph H. Peterson,* with whom *Messrs. Harley W. Gustin* and *D. Worth Clark* were on the brief, for respondent.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

James Prinsen when he died was a member of the petitioner, a fraternal benefit association, incorporated under the laws of Missouri. By his certificate of membership, benefits in case of death were payable to his wife, Uluetta Prinsen, the respondent in this court. The payment to be made to her in the event of death by accident was $5,000, unless the accident occurred while the member was engaged in enumerated activities. Death suffered in such circumstances was excluded from the coverage. By the terms of the certificate the association was not to be liable if disability or death occurred "when a member is par-

578

ticipating . . . in the moving or transportation of gunpowder, dynamite, or other explosive substance or substances." [1]

At the time of his death Prinsen was an officer of the Western Powder Company, which had an office in Salt Lake City, Utah, and a powder magazine outside the city limits. The Tintic Powder and Supply Company gave an order to the Hercules Powder Company for 300,000 dynamite caps, and the Hercules company asked the Western company to fill the order. The request was received by Prinsen, and with it a notice that within a few days the Hercules representative, Begaman, would come to Salt Lake City to accept delivery. On February 3, 1931, Begaman appeared at the Western office with a

[1] The full text of the exception follows: " This Association shall not be liable to a member or his beneficiary for any disability benefits, special loss benefits or death benefits, when the disability, special loss, or death of a member occurs under any of the following conditions or circumstances; when inflicted by a member on himself, while sane or insane; when there are no visible marks of injury upon the body (the body itself not being deemed such a mark in case of death); when or while a member is in any degree under the influence of intoxicating liquor or liquors or of any narcotic or narcotics; when caused wholly or in part by reason of or in consequence of the use of intoxicating liquor or liquors or the use of any narcotic or narcotics; when caused wholly or in part by any bodily or mental infirmity or disease, dueling, fighting, or wrestling; when or while a member is acting as a sailor or soldier or is participating in war or riot; when or while a member is acting as an aviator or balloonist or is participating in aerial navigation or aeronautics of any kind either as a passenger, operator or assistant; when a member is participating in public or agreed automobile racing, or in wrecking, mining, blasting, or in the moving or transportation of gunpowder, dynamite, or other explosive substance or substances; when a member is murdered; when resulting from hazardous adventure or an altercation or quarrel; when there is a disappearance of a member; when the result of voluntary over-exertion (unless in a humane effort to save a human life); when the result of voluntary or unnecessary exposure to danger or to obvious risk of injury."

motor truck in which he was to carry the explosives. He and Prinsen then drove to the magazine beyond the city. The magazine was opened with a key which Prinsen had brought with him, and delivery of the caps was made by piling them in boxes on the truck. The two men then boarded the truck again to go back to the Western office, Begaman driving the car, and Prinsen sitting beside him on the box. A small additional payment was made by Hercules to Western for the trip to the magazine, but Tintic, not Hercules, was the owner of the truck. On the way back, the truck was in collision with an engine while crossing the tracks of the Denver and Rio Grande Railroad. There was an immediate explosion, in which the truck was destroyed and Prinsen was blown to pieces. Begaman and the railway engineer were killed at the same time.

The respondent brought suit on the membership certificate to recover the benefits payable in the event of death by accident. The association defended on the ground that the member was killed while " participating " in the transportation of explosives. In the District Court a verdict was directed in favor of the defendant. The Court of Appeals reversed, one judge dissenting. 65 F. (2d) 841. This court granted certiorari to resolve a possible conflict with other federal decisions. *Pittman* v. *Lamar Life Ins. Co.*, 17 F. (2d) 370; *Head* v. *New York Life Ins. Co.*, 43 F. (2d) 517.

We assume in favor of the respondent that " participation " in the carriage of explosives imports something more than the presence of the assured in the vehicle of carriage. One who becomes a passenger in an aeroplane may thereby participate in aeronautics (cf. *Head* v. *New York Life Ins. Co.*, *supra*; *Bew* v. *Travelers Ins. Co.*, 95 N.J.L. 533; 112 Atl. 859; *Pittman* v. *Lamar Life Ins. Co.*, *supra*), but it does not follow that he participates in the carriage of the mails, and this though the plane to his

knowledge is in part devoted to that use. One who travels in a sleeping car does not participate thereby in the movement of explosives, though information is brought home to him that in a baggage car forward explosives are in transit. But Prinsen's relation to this enterprise was not so remote or passive as the relation of the passenger in the cases just supposed. He had gone upon a truck which had been specially devoted by its owner to the transportation of explosives, and had gone there for the very purpose of making transportation possible. The respondent would have us split into separate parts a transaction that is unitary in aim and essence. Plainly the assured was facilitating the delivery of explosives in traveling with Begaman to the suburban magazine. Plainly he was still engaged in and about a like service when he opened the magazine and placed the caps upon the truck. But his participation in the errand did not end abruptly then and there. The return journey to his office had the same motive and occasion that induced the journey out. It was not an adventitious incident that there were explosives in the truck when he left the magazine. To the contrary, it was part of the plan from the beginning that the truck should take him out, and then, when laden, take him back. To say that he was riding on the truck " while " explosives were transported is to state but half the case. The case is rather this, that he was riding on the truck " because " explosives were transported. If he had not known in advance that this was the substance to be carried, he would not have stirred out of his office. There was a relation more intimate than contiguity in time or space between his presence on the truck and the presence of the explosive caps. The relation was no accident; it was pre-ordained and causal.

The respondent tells us that the assured at the time of the collision was a voluntary guest, and makes much of

the label. The payment or non-payment of a fare has little, if any, bearing upon the problem to be solved, yet the label, unless scrutinized, may have capacity to mislead. In his relation to this enterprise, Prinsen was more than a voluntary guest. He was a business "invitee," riding out and back at the invitation of the owner because of a business interest common to them both. *Bennett* v. *Railroad Co.*, 102 U.S. 577, 582, 584; *Heskell* v. *Auburn L., H. & P. Co.*, 209 N.Y. 86; 102 N.E. 540; *Haefeli* v. *Woodrich Engineering Co.*, 255 N.Y. 442, 448; 175 N.E. 123; *Indermaur* v. *Dames*, L.R. 1 C.P. 274; American Law Institute, Restatement of Torts, Tentative Draft, No. 4, §§ 202, 213. We may see the case more clearly if we ask ourselves the question whether Begaman would have been free to leave the "guest" at the magazine after delivery of the caps, and refuse to bring him home. Plainly not, without breach of duty to the Tintic company, the employer, which had sent the car out with instructions to the driver to carry Prinsen back. The result is all one whether the instructions in respect of carriage were tacit or express. By reasonable implication, the return trip as well as the outward one was within the orbit of the errand. *Cudahy Packing Co.* v. *Parramore*, 263 U.S. 418, 426; *Bountiful Brick Co.* v. *Giles*, 276 U.S. 154, 158; *Voehl* v. *Indemnity Ins. Co.*, 288 U.S. 162.

The argument is made that a causal connection between the death and the explosion is not a necessary inference from the facts in evidence. The assured was blown to pieces, the fragments of his body being so small that an autopsy was impossible. We are told that even so the impact of the engine may have been fatal without more. The contract does not say that the holder of the policy is to have no claim against the insurer if he dies "by reason of" his participation in the carriage of explosives. The contract says that he is to have no claim

against the insurer if he dies " when " he is participating in the carriage of explosives, just as it provides for a like result when he is acting as a sailor or a soldier, or is participating in war or riot, or is under the influence of narcotics or of intoxicating liquors.[2] Courts of high authority have held that in policies so phrased there is no need of any causal nexus between the injury or death and the forbidden forms of conduct.[3] While the proscribed activity continues, the insurance is suspended as if it had never been in force. Other courts prefer the view that to work such a suspension, there must have been an aggravation of the hazard to which death or injury was owing.[4] In

[2] A nice discrimination is maintained throughout the policy in suit between causes of the casualty and aggravations of the hazard. Thus, liability is excluded when the accident is " the result " of voluntary overexertion, or " the result " of voluntary or unnecessary exposure to danger, or when " caused " by any bodily or mental infirmity or disease. There is no such insistence upon a causal sequence when the insurer is participating in a war or a riot, or in aeronautics or in the transportation of explosives.

[3] *Order of United Commercial Travelers* v. *Greer*, 43 F. (2d) 499; *Flannagan* v. *Provident Life & Accident Ins. Co.*, 22 F. (2d) 136; *Murdie* v. *Maryland Casualty Co.*, 52 F. (2d) 888; *Shader* v. *Railway Passenger Ins. Co.*, 66 N.Y. 441; *Conner* v. *Union Automobile Ins. Co.*, 122 Cal. App. 105; 9 P. (2d) 863; *Bradshaw* v. *Farmers & Bankers Life Ins. Co.*, 107 Kan. 681; 193 Pac. 332; *Order of United Commercial Travelers* v. *Tripp*, 63 F. (2d) 37. Cf. *U. S. Fidelity & Guaranty Co.* v. *Guenther*, 281 U.S. 34; *Metropolitan Life Ins. Co.* v. *Conway*, 252 N.Y. 449, 452; 169 N.E. 642.

[4] *Matthes* v. *Imperial Accident Assn.*, 110 Iowa 223; 81 N.W. 484; *Bradley* v. *Mutual Benefit Life Ins. Co.*, 45 N.Y. 422; cf. *Jones* v. *U.S. Mutual Accident Assn.*, 92 Iowa 652; 61 N.W. 485; *Accident Insurance Co.* v. *Bennett*, 90 Tenn. 258; 16 S.W. 723; *Murray* v. *New York Life Ins. Co.*, 96 N.Y. 614; *Benham* v. *American Central Life Ins. Co.*, 140 Ark. 612; 217 S.W. 462; *Kelly* v. *Fidelity Mutual Life Ins. Co.*, 169 Wis. 274, 276; 172 N.W. 152; *Bloom* v. *Franklin Life Ins. Co.*, 97 Ind. 478; *Cluff* v. *M. B. Life Ins. Co.*, 13 Allen 308.

that aspect the insurer might be liable if the insured had fallen from the box while asleep or inattentive, the dynamite caps remaining unexploded in the truck. So, policies excluding liability while the assured is doing an act in violation of the law have been read as directed to acts that aggravate the danger, with the result that liability is unaffected by violation of the Sunday laws or of the laws against profanity. See the cases cited in note 4, *supra*.

In so far as these readings of the policy diverge, there is no need to choose between them for the decision of the case at hand, nor to search for a formula that may have capacity to reconcile them. If the first meaning is accepted, the controversy ends. If the second is accepted, it is still clear beyond debate that the effect of the forbidden act was to magnify the risk of death in the event of a collision, to aggravate the danger in the very event that happened. Less than this may be required to relieve the insurer of liability, but surely nothing more.

The good sense of this construction of the policy has illustration in the case before us. At the very least the explosion was a concurrent cause of death, if not indeed the sole one. The policy does not mean that in the event of a proscribed activity there shall be a segregation of causes operating in unison and a distribution of the consequences assignable to each. One of the essential purposes to be served by the limitation of the risk is to put an end to such a process of dissection and comparison. By the form of its policy the insurer has given notice to assured and beneficiary that it will refuse to become entangled in these mystifying subtleties. At the moment of the casualty the insurance was suspended by an aggravation of the hazard, and suspended it remained till the forbidden hazard was removed.

584

The judgment of the Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*

MR. JUSTICE STONE, dissenting.

I think the judgment should be affirmed.

If " participation " means coöperation in the transportation, more than is involved in presence on the transporting vehicle with the knowledge that an explosive is being carried, I can perceive no ground for saying that there was participation here. That deceased had made the journey to deliver the caps and, as a " business invitee," had a right to return on the vehicle on which he had placed it, seems to me as irrelevant as though the deceased had embarked as a passenger on a railroad train on which the explosion occurred after he or his firm had shipped dynamite upon it. By the terms of the policy, participation, to exclude liability, must be at the time of the injury. After the return journey began, deceased did nothing to facilitate the transportation. He neither controlled nor had the right to cor rol it. He was merely present. The distinction drawn between this case and that of mere presence, so difficult of statement and application, appears to me to obscure rather than to define the meaning of the term and to violate the cardinal principle that, so far as their language reasonably admits, insurance contracts are to be interpreted most favorably to the insured.