**MAHONING NATIONAL BANK OF YOUNGSTOWN v MASSACHUSETTS MUTUAL LIFE INSURANCE CO.**

Ohio Appeals, 7th Dist, Mahoning Co

No 2485.

Harrington, Huxley & Smith, Youngstown, for plaintiff-appellee.

Hahn & Shermer, Youngstown, for defendant-appellant.

## OPINION

By BENNETT, J.

The plaintiff, as Trustee, was named beneficiary in a life insurance policy upon the life of Frank C. Cook. The defendant company has already paid the beneficiary the $10,000 face amount of the policy upon the death of Mr. Cook, but refused to pay an additional $10,000 which the plaintiff claims is due under the terms of a rider which provided for payment of that amount in the event that death occurred through accident. Mr. Cook's death occurred following an automobile wreck at New Bedford, Pa., and the defense of the company is that under the terms of the "Accidental Death" rider, the additional benefits were not to be paid "if the death of the insured resulted directly or indirectly * * * from any violation of the law by the insured."

The jury returned a verdict for the plaintiff, upon which judgment was entered by the Common Pleas Court, and the defendant has appealed to this court on questions of law, relying chiefly, as grounds of error, on the claims (1) that a verdict should have been directed for the defendant, or, at worst, that the jury's verdict was against the manifest weight of the evidence, and (2) that error occurred in giving a requested charge of the plaintiff before argument.

The decedent had been driving east on U. S. Route 422 from Youngstown, Ohio, on his way to the home of a friend at Pulaski, Pa., at about one o'clock A. M. He would leave Route 422 at New Bedford, Pa., where the road forked. He was to take the left fork to go to Pulaski, while Route 422 continued on as the right fork to New Castle, Pa. The roads forked at a wide angle in the center of which was located a church on a high bank or low hill, and across the front of this bank was a heavy concrete wall, several feet high, on which was paint-

ed a large black and white traffic sign, indicating the left fork as the road to take to Westminster College. Instead of turning to the left toward Pulaski, the decedent just turned enough to the right, apparently, to miss the right end of the concrete abutment with the front end of the car, but the rear of his car struck the abutment, one front wheel struck a ditch bridgehead and the car turned over. The decendent was thrown out of the car, which immediately caught fire.

The decedent was alone in his car and there were no eye witnesses to the way in which the accident happened. The purpose of the defendant's evidence has been to try to show circumstantially that the probabilities were that the decedent's death was caused by violation of the Pennsylvania speed statutes. Reliance is also put upon the statutory requirements for headlights and upon the statute which requires driving on the right hand side of the road.

It is conceded that in order to bar recovery the "violation of law" must have been a violation of the criminal law. The applicable Pennsylvania criminal statute relative to speed (Act of 1935 Pamphlet Laws 1056, page 1083, Section 1002—subsection B, Paragraph 4) reads as follows:

"(a) Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed, not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other restrictions or conditions then and there existing; and no person shall drive any vehicle upon a highway at such speed as to endanger the life, limb or property of any person nor at a speed greater than will permit him to bring the vehicle to a stop within the assured clear distance ahead.

(b) Subject to the provisions of subsection (a) of this section, speed in excess of the maximum limits hereinafter provided shall be unlawful.

(1, 2 and 3 not applicable).

4. Forty (40) miles an hour speed limit. All vehicles, except those otherwise restricted by this act to lower maximum speed."

It is true, as argued by plaintiff's counsel, that no one knows for certain what happened. The burden is on the defendant to show that the death resulted "from a violation of law by the insured." The defendant relies entirely on the inferences which may be drawn from certain bits of circumstantial evidence. The court left to the jury in the first instance the question of deciding whether this circumstantial evidence had satisfied them that violation of law by Mr. Cook resulted in his death. The jury was not persuaded, and by its verdict found, that violation of law was not a direct or indirect cause of the death.

We believe that this finding was manifestly against the weight of the evidence.

In order to show a "violation of law" by the decedent, it is only necessary, under the Pennsylvania statute, to show that he was going faster than "a careful and prudent" speed, going at a speed "greater than is reasonable and proper, having due regard to the traffic, surface, width of highway, and of any other restrictions and conditions then and there existing." **State v O'Mara, 105 Oh St 94.**

And furthermore, the policy provides for the exception from liability if the death "resulted directly or indirectly" from such a violation of law.

Policies are written containing many differently worded clauses of this general nature. Some courts have held that there need be no showing of causal relation between the death and the forbidden forms of conduct, as for instance, in cases of an exception of "while intoxicated." Flannagan v Provident Life & Accident Insurance Company, 22 Fed. (2) 136. Others, as noted in the opinion and note in Travelers v Prinsen, 291 U. S., 576, 54 S. Ct. 502, have held that the purpose of these exceptions requires an aggravation of the hazard forbidden. The Court of Appeals in the Fifth District in **Washington Fidelity v Herbert, 49 Oh Ap 151,** has repudiated the idea that an exception in an accident policy for accidents occurring "when intoxicated" should eliminate accidents having no relation at all to the fact of intoxication, using the illustration of an intoxicated man struck by lightning. They use the further illustration that "if the insured had lost his rear license tag, and was driving his car without knowledge of that fact, and a collision occurred" the insurance company ought not to escape liability on the ground that the accident occurred while the insured was violating the law in driving without the license plate. The conclusion of that Ohio court was that there must be some causal connection between the proscribed conduct and the accident.

This must certainly be true where the language of the policy contains the word "caused by" or "directly caused" or "solely caused". But there are literally hundreds of cases in the books involving the question

of causation as to these exceptions, and many rules have been developed in dealing with various combinations of facts and of different clauses in policies. Obviously, when insurance companies enter this field the premium rate to be charged will depend entirely on the class of risks they are insuring, and various phrases have been used to make certain that the exception for accidents caused by violations of law were not to be limited to the sometimes metaphysicial question of a proximate cause. Couch Cyc. of Insurance Law, Sections 1236, 1465, 1136; Szymanska v Equitable Life Ins. Co., 183 A. 309.

. The particular clause in the instant case, "resulting directly or indirectly from a violation of law by the insured" is one of the newer clauses. It requires a causal relationship between the violation of law and the death, but does not require that the violation be a proximate cause. This clause has been construed in **Runyon, Admx. v Western & Southern Life Insurance Company, 48 Oh Ap 251,** in which it has been held that the death of the decedent in the Ohio penitentiary fire was "indirectly" attributable to the violation of the law for which he was incarcerated. While the writer is inclined to disagree with the decision in that case, we are in unanimous agreement that the phrase "resulting directly or indirectly" requires definitely less than that the violation of law be the proximate or sole or principal cause of what happened. All that is required is that the unlawful conduct have some reasonable █ causal connection with the result and with the risk against which the company was writing its insurance.

' The question of causation is important in the instant case because we have to determine what happened through inferences from circumstantial facts. Plaintiff's counsel contend that there is no evidence which gets the matter out of the realm of speculation and guess work; that another car may have darted out of the Pulaski road in front of Cook; or that many things **may** have happened. Defendant's counsel contend that the evidence shows "that Frank C. Cook either (1) intentionally drove his car into said concrete wall, which all parties concede and admit was not done, or (2) that he had no lights, and therefore did not see the turn in the road or the concrete wall in time to turn and avoid colliding with it, or (3) that he was operating his said car at such an unlawful speed that he covered the lighted space made by the beams of his lighted headlights in such brief inter-

val of time that he was unable to negotiate and turn before crashing into the wall."

The writer's personal opinion, after reading all the testimony and looking at the pictures, is that the car left the road not because of such a high rate of speed that it could not make the curve, but because of inattention of Mr. Cook and a failure to realize that he had reached the fork. He was intending to turn left. He turned right. As we understand the somewhat sketchy evidence about his wheel tracks, they did not show tracks which would indicate an inability to hold the road on the curve, but tracks which continued off the concrete toward the concrete pier. The driver apparently saw the pier when almost upon it, turned the front wheels before hitting it, sufficiently soon to miss it with the front end of the car but to strike it with the rear end. In other words, it seems reasonably clear that the most direct cause of the leaving the road was not speed alone, but a failure, through inattention or sleepiness or some other cause, to see that he had reached the fork in the road. There being absolutely no evidence that the lights were defective, the reasonable inference that the immediate and most direct cause of leaving the road was inattention upon the part of the driver. However, even though inattention may have been the primary cause of the collision, nevertheless the speed at which he was traveling certainly had a causal relationship to the collision, and also to the fact that the collision was violent enough to have fractured his skull and to have killed him.

Was there evidence from █ which the jury should have found that the speed was "in violation of law"? As we understood counsel during argument, it was the belief of both sides that a speed of forty miles per hour would have been unlawful under the terms of the act quoted above. We have been somewhat doubtful as to the meaning of the first clause of this sub-division, which is a qualification of the forty mile provision, reading as follows:

, "(b) Subject to the provisions of subsection (a) of this section, speed in excess of the maximum limits hereinafter provided shall be unlawful." .

Whether this qualification is intended to mean that under proper conditions more than forty miles would be lawful or was intended simply to mean that sub-section (b) was not intended to qualify the requirement of sub-section (a) that the speed must

at all times be reasonable and prudent, is not too clear to us. No Pennsylvania case is cited on the question and a somewhat superficial search by the court has not revealed any. The basis for our decision has made the question academic. Also, a majority of the court is unable to say that the jury would have been manifestly wrong if they had found that the defendant had failed in the burden of establishing that the speed was over forty miles per hour. The physical results could have been caused by a thirty-nine mile speed, or even less, the testimony of the New Bedford residents was certainly weak, at best, as to miles per hour, and there was a difference in testimony between Mr. Cook's two companions who were following him in the other car. Both of these witnesses took the stand and were observed by the jury. Remembering also that this testimony is all circumstantial as to the speed at the fork of the road where the accident occurred and that there is no presumption that speeds maintained outside of the village would be continued after entering the village, we do not feel that it can be said that the evidence manifestly requires the conclusion that Mr. Cook was exceeding forty miles per hour.

On the other hand, we unanimously agree that the inferences which are to be drawn from the testimony introduced do manifestly show that Mr. Cook must have been proceeding at a speed greater than a "careful and prudent speed" and one "greater than * * * reasonable and proper, having due regard to the * * * conditions then and there existing." We believe that a speed of much less than forty miles an hour, when at the fork, a few feet from the concrete pier immediately in front of him, would be greater than reasonable, proper or prudent, "having due regard to the conditions then and there existing." The badly wrecked car, the ripping off of the door, and throwing it many feet beyond the spot where the car itself came to rest, the testimony of the two New Bedford residents, even if "only half awake and in a half stupor", would, taken together, indicate that, whether Mr. Cook's speed was twenty or forty or sixty miles an hour, it was too fast to be reasonable, proper or prudent after he reached some spot near the pier and hence would be "unlawful". **State v O'Mara, 105 Oh. St 94.**

We believe also that the same evidence adequately bears the burden which is on the defendant of showing that this imprudent speed had a reasonable causal relationship to the accident and to the blow which fractured Cook's skull and resulted in his death.

See Witt v Spot Cash Insurance Company (Kan. 1929) 276 Pac., 804, in which the language of the exception in the policy was "caused or contributed to by violation of the law."

Complaint is also made of a charge which was given before argument at the request of the plaintiff, reading as follows:

"I charge you, Members of the Jury, that a person whose death is caused by accident while operating an automobile, is presumed to have been operating the automobile in a lawful manner at the time of his death, and if you find that Frank C. Cook met his death as the result of accident, the presumption that he was operating his car in a lawful manner is not rebutted by the unexplained fact alone that the body of Frank C. Cook was found unconscious in a roadside ditch some distance from his overturned and burning car."

As to this alleged error, plaintiff's counsel rely on Meadows v Insurance Company, 31 S. W., 578. The part of the request as to which complaint has been made has been copied practically verbatim from language of the court on page 584 of that case. However, the fact that an abstract statement of law may be correct, does not alone make it a proper statement for a requested charge, especially when the copied statement is addressed to the facts of the particular case. In the case cited, the fact relative to the body may have been "unexplained". In our case, all the plaintiff's testimony was addressed to explaining how the body happened to get into the ditch with a fractured skull. It would certainly have been error if the request had read, * * * and such presumption is not rebutted by the fact, **which is unexplained,** that the body of Frank C. Cook was found unconscious, etc." We believe that the language of the request is susceptible to being misunderstood as assuming the answer to this jury question and as being an assertion by the judge that it had not been "explained".

"It may be laid down as a broad general rule that a trial court should never, either of its own motion or at the ▆▆▆▆▆ request of either party, give a charge to the jury which assumes as true the existence or non-existence of any material fact in issue or material fact affecting the issues in respect to which the evidence is in conflict or as to which there is a dispute, or use language

from which the jury might reasonably infer that the court assumes the existence of such a material fact, and thus assume to itself the prerogative of deciding as well the facts as the law of the case. If the court does in fact assume such matters to be fully established, it invades the province of the jury and commits reversible error.

### 39 O. Jur. TRIAL, §292.

We believe that the charge was improper and should not have been given. We are in doubt as to whether it actually did mislead the jury and was prejudicial. Our doubt on this point is increased by the fact that defendant's counsel themselves have not complained of it upon this ground. Inasmuch as the matter has become academic at best, because of the fact that the case is being reversed on the other ground, we content ourselves with saying that the request should not be given on retrial.

Another interesting question upon retrial is that of certain testimony of P. D. Rupp and Mrs. Ellis Harry. Signed statements of these two witnesses were taken shortly after the accident by an investigator of the defendant. The defendant then took their depositions and the testimony given on direct examination did not please counsel and did not agree in certain respects with the language of the statement given to the investigator. Mrs. Harry very flatly testified she had never said certain things included in her statement and that she had signed it without reading it. After thinking the matter over, counsel for defendant took a second set of depositions, confronted these witnesses with their signed statements and proceeded to cross-examine them, with the assertion that they had been taken by surprise and that the witnesses were hostile. On the theory of refreshing the recollection of the witnesses, counsel by their questions then read into the deposition all of the contents of the signed statements, and we note with interest that they copy into their briefs the assertions which were contained in these signed statements as being the testimony of these witnesses.

When the case came on for trial, the defendant offered these depositions in evidence and began at the beginning and read to the jury all of the questions asked by them and the answers; and plaintiff's counsel likewise offered and read the questions and answers of their own cross examination. Numerous objections to specific questions were made and also general objections to the procedure followed in the cross ex-

amination of their own witnesses by the defendant's counsel. In the main, the trial court overruled these objections. Time and space prevent taking these questions up seriatim, but for purposes of the second trial, we wish to set forth the abstract principles which in our judgment should govern the offer of this testimony.

In the first place, the right to cross examine one's own witness on the ground of hostility and surprise is, in the nature of things, a right applicable to surprise at the time the litigant offers testimony by that witness in his own behalf at trial.

The taking of the deposition did not make any part of it testimony. Each syllable of it became testimony only when offered at the trial and admitted by the court. When the defendant, for reasons of its own, offered the portion of the testimony which it did not like, it thereupon made that witness its witness and did so at a time when it knew every syllable of what the testimony of that witness would be. There was no surprise at the time at which it saw fit to offer this evidence. As to hostility, there was no difference between offering this hostile witness and any other witness whose story would hurt their case. Under our system of jurisprudence, a litigant is not permitted to make his case by putting a witness on the stand, eliciting an answer which he knows will hurt him and rely on his ability thereafter to discredit the witness and to make him out a liar. And this is particularly important with relation to prior statements. Counsel may feel that a written statement by John Doe that an automobile was going sixty miles an hour is the truth and helpful to his side. This written statement is not available as evidence itself. He must put John Doe on the stand. If before doing so he learns that John Doe will testify that the automobile was not going sixty, but thirty miles an hour, he cannot then deliberately put Doe on the stand, elicit the thirty miles answer which he knew he would get, and then cross examine him and both impeach the hurtful answer and also work the statement into the case through the back door when he could not get in through the front door. The somewhat unusual additional situation in the present case is the fact of first getting the testimony through the depositions. The principle is no different. The defendant, when it offered the testimony of these two witnesses at the trial, knew precisely what the testimony was. It could not then take any advantage of any of the extraordinary privileges

of examination given to attorneys who are surprised by having witnesses misfire while on the stand.

Even when taken by surprise at trial, the use of an inconsistent statement in further examination is only for purposes of refreshing the witness' recollection. Counsel who tendered him as a witness cannot impeach him.

Hurley v State, 46 Oh St 320; State v Duffy, 134 Oh St 16.

And also, of course, they cannot introduce the statement as affirmative evidence of the facts therein recited. Even under the record made in the present case, the defendant's counsel was entirely unjustified in presenting, as they did, in their brief, the recitals of the original signed statements as being evidence in the case of those facts.

We accordingly believe that as soon as the defendant offered testimony by each of these witnesses, it thereby made that witness its own witness; that inasmuch as at the time it made that offer it was under no hallucinations as to what the answers would be, it could thereafter ask no questions on the ground of surprise, for purpose of refreshing recollection, for purposes of impeachment or for purpose of trying to work in indirectly the statements contained in the written statement taken by the investigator; and that some of the questions which were asked these witnesses, which have the vice only of being leading, are to be governed by the usual discretion of the trial court as to their propriety.

It may be unfortunate for the defendant, if the recitals in the original statements are the truth, that it cannot force the truth out of these witnesses. But when counsel come to making their case, they have to take the witnesses as they find them. If they put them on and offer the part that hurts they are thereafter subject to the rules governing examination of one's own witnesses.

These remarks are of course addressed to the type of proffer made at the trial in the record now before us. We of course express no opinion as to possible other limited proffers which may be made on retrial.

For the reasons given, the judgment is reversed and the cause is remanded to the Common Pleas Court for retrial. Judge Carter wishes it said that he believes that final judgment should be entered for this defendant.

Reversed and remanded.

NICHOLS, PJ, concurs in the judgment.

CARTER, J, concurs, with the qualification above stated.