283 F.2d 659
 UNDERWRITERS AT LLOYD'S OF LONDON, Victoria Insurance
Company, Ltd., Orion Insurance Company, Ltd., and
Eagle Star Insurance Company, Ltd., Appellants,
v.
CORDOVA AIRLINES, INC., Appellee.
 No. 16283.
 United States Court of Appeals Ninth Circuit.
 Oct. 25, 1960.
 
 Edgar Paul Boyko, Los Angeles, Cal., Arthur D. Talbot, Anchorage, Alaska, for appellant.
 Stanley J. McCutcheon, Anchorage, Alaska, for appellee.
 Before HAMLIN and KOELSCH, Circuit Judges, and BOWEN, District Judge.
 KOELSCH, Circuit Judge.
 
 
 1
 This is an appeal by the Underwriters at Lloyd's of London and other participating underwriters from a judgment entered upon a jury verdict in favor of Cordova Airlines, Inc., in the latter's suit to recover under an insurance policy for the total loss of an aircraft which crashed near Iliamma Lake, Alaska, on December 18, 1955. We have jurisdiction under 28 U.S.C.A. 1291 and 1294(2).[1]
 
 
 2
 At the time of the crash the plane was operating under a ninety-day charter or contract to Morrison-Knudsen Company and then engaged in transporting dynamite to a construction site at 'Big Mountain,' Alaska, where Morrison-Knudsen was a subcontractor for Western Electric Co. in erecting an air defense radar installation for the United States Air Force. It is undisputed that the dynamite being carried by the aircraft did not explode either before or after the accident; the actual cause of the accident is unknown (the pilot was killed instantly). After the crash, the airline promptly presented its claim under the policy for the full value of the aircraft ($15,200.00), but the insurer denied liability because of purported violations of the policy during the flight.
 
 
 3
 Appellant urges that Cordova breached the terms of the policy and presents three basic violations which assertedly preclude recovery on the insurance contract: (1) that Cordova carried dynamite on the flight without first obtaining a waiver from the Civil Aeronautics Authority, (2) that the carriage of dynamite without such waiver constituted an 'unlawful purpose' proscribed by the terms of the policy, and (3) that the aircraft was overloaded in violation of the Operations Manual of the Civil Aeronautics Authority. Several errors are assigned to the lower court's instructions to the jury based upon appellant's view of the legal effect of the terms of the policy, but the essential point urged is that the lower court erred in refusing to grant appellant's motion for a directed verdict.[2]
 
 
 4
 We find it unnecessary to consider all of the issues asserted because we agree that the lower court should have directed a verdict in favor of appellant on the basis of the first question stated above, i.e., failure to obtain a waiver to carry the dynamite, and we rest our conclusion solely on that ground.
 
 
 5
 The particular clause in the policy relied upon by appellant is as follows:
 
 
 6
 'General Exclusions
 
 
 7
 'This Certificate and/or Policy do not cover:
 
 
 8
 '1. Any loss, damage or liability arising from:
 
 
 9
 '(a) * * *
 
 
 10
 '(b) * * *
 
 
 11
 '(c) * * * any flying in which a waiver issued by the Civil Aeronautics Authority is required unless with the express written consent of Farwest General Agency for Insurers.'
 
 
 12
 It is not disputed, and the record clearly shows, that no waiver was obtained for carrying the dynamite on the flight.[3] The questions raised under this exclusionary clause, then, are as follows: (1) whether a waiver was required under the applicable Civil Air Regulations, and if so, (2) whether the failure to obtain a waiver must have also caused or contributed to the loss incurred in order to preclude recovery by Cordova.
 
 
 13
 The applicable Civil Air Regulations are not a paragon of logical organization of graphic lucidity, yet hey are not hopelessly unintelligible. The basic provision is 14 C.F.R. 49.0, which provides in part that 'explosives or other dangerous articles * * * shall not be loaded in or transported by civil aircraft in the United States * * * except as provided in this part (i.e., Part 49).' Section 49.81 contains a more specific prohibition:
 
 
 14
 'No explosive or dangerous article listed in the ICC Regulations (49 CFR Part 72) as an Explosive A, a Poison A, a forbidden article, or as an article not acceptable for rail express * * *, nor any article listed in Appendix A shall be carried on aircraft subject to the provisions of this part.'
 
 
 15
 The controlling provision 'of this part' is found in Section 49.41 under the subheading, 'Cargo Aircraft,' which provides as follows:
 
 
 16
 'In addition to the articles acceptable for transportation on aircraft carrying passengers,[4] any article acceptable for and packed, marked, and labeled in accordance with the ICC Regulations (49 CFR Parts 71-78) for transportation by rail express may be carried in cargo aircraft: Provided, that no article listed in Appendix A of this part shall be carried except under the provisions of 49.71 (special authority or 'waiver' by the CAA Administrator). The maximum quantity in any one outside package or container shall not exceed that prescribed in the commodity list of the ICC Regulations (49 CFR Part 72).'
 
 
 17
 Applied to the present case, we must first determine whether the dynamite in question was a 'prohibited article' within the meaning of Section 49.81, and if so, whether its carriage was permissible under Section 49.41 without requiring the special authority of Section 49.71.
 
 
 18
 The dynamite carried on the flight here involved was described in a letter from Morrison-Knudsen Co., Inc., to the Civil Aeronautics Board (Defendant's Exhibit B, admitted in evidence without objection by appellee), which stated that the plane hauled a '* * * cargo of 50-pound boxes of Atlas Giant 40% Stick dynamite * * *.'[5] Section 49.81 prohibits those explosives designated as 'Class A' under the ICC Regulations, 49 CFR Part 72; those regulations, at Section 72.5, list numerous articles, their lettered classifications, exemptions from packing and labeling requirements, and the maximum quantities to be shipped in one container by rail express: under the heading 'Dynamite' is the reference, 'See High explosives,' and the latter has two headings, 'High explosives' and 'High explosives, liquid'; both are designated as Class 'A' and neither is exempted from packing and labeling requirements. Thus, it is clear that all dynamite is treated as a high explosive, listed as an 'Explosive A,' and therefore prohibited from transportation unless otherwise excused.
 
 
 19
 Section 49.41 of the Civil Air Regulations allows cargo planes to carry articles allowed on passenger-carrying aircraft, but these do not include Class 'A' explosives (see note 4, supra); in addition, however, this same regulation does allow transportation of any article 'acceptable for and packed, marked, and labeled in accordance with the ICC Regulations * * * for transportation by rail express * * *,' provided the maximum quantity does not exceed the maximum allowed for each outside container in the ICC Regulations (49 CFR Part 72).
 
 
 20
 In 49 CFR 72.5, under the heading 'Maximum quantity in 1 outside container by rail express,' liquid high explosives are stated to be 'Not accepted'; all other high explosives are referred to 73.86. The latter section refers to rail express shipments in subparagraph (d), 'Samples of explosives and explosive articles for transportation by * * * rail express * * *' and imposes certain requirements, for example: samples must consist of not more than one-half pound of explosive and not more than twenty one-half pound samples for laboratory examination can be packed in one outside package.
 
 
 21
 It is clear from the foregoing that dynamite is a prohibited article which cannot be transported unless acceptable for railway express shipment; but under the ICC Regulations, 73.86, the only acceptable explosives are 'samples' which cannot exceed twenty one-half pound packages, or ten pounds maximum. In this case there was some dispute as to howe many cartons were carried on the plane; there was no dispute, and in fact the parties stipulated, '* * * that the dynamite carried on the flight in question weighed 50 pounds net per carton * * *.'
 
 
 22
 The airline argues, however, that Section 73.61 of the ICC Regulations makes it impossible to determine in this case whether the type of explosive carried by it was in fact prohibited, for the section states tht 'high explosives (dynamite), except gelatin dynamite, when offered for transportation by rail freight or highway must not contain in excess of 60 per cent of liquid explosive * * *.' It is urged that there is no way of knowing from the present record whether the dynamite in question was gelatin or contained in excess of 60% Liquid explosive.
 
 
 23
 This argument is without merit because Section 73.61 is in no way connected with the classification of explosives or shipment by railway express; it merely states the shipping requirements of high explosives, excluding gelation dynamite and certain liquid explosives, which are thoroughly covered under Sections 73.62 and 73.63. All of these explosives are classified under Section 72.5 as 'high explosives'-- Class A, and all are progibited from transportation under Civil Air Regulations (14 CFR 49.81) unless they fall within the limited exception for a shipment of 'samples' by railway express under 49 CFR 73.86.
 
 
 24
 We can therefore find no basis in either the CAB or ICC Regulations which would exempt the carriage of dynamite from the provisions of 14 CFR 49.81, prohibiting its transportation by aircraft. Under such circumstances, Cordova was required to follow the procedure outlined in 14 CFR 49.71(a), 'Deviations from any of the provisions of this part for a particular flight may be authorized by the Administrator where he finds that the conditions under which the articles are to be carried are such as to permit the safe carriage of persons and cargo.' See also, 49.71-1, 49.71-2, 49.71-3. We think, therefore, that a 'waiver' was required within the meaning of Clause 1(c) of the policy, and since it is undisputed that no waiver was in fact obtained, Cordova thereby breached its insurance contract.
 
 
 25
 Cordova urges, however, that even if a waiver was necessary to carry the dynamite, this requirement was excused by the blanket authority of Order S-712, an authorization promulgated by the Civil Aeronautics Board in December, 1955 allowing the Air Force to ship Class 'A' explosives by air.
 
 
 26
 The Order was issued under the 'special authority' provisions of 49.71 of the Civil Air Regulations and granted the Air Force's request to carry certain Class A explosives 'in civil air craft to certain military and civil airports in the United States'; the shipments were to follow a 'regular route pattern, originating at Tucson, Arizona, and shipped to Air Defense Command Bases throughout the United States, some of which re located at municipal airports.' This authority was subject to certain conditions: (1) it was limited to 'charter or contract aircraft obtained for the exclusive purpose of transporting such explosives,' (2) the Air Force must follow and certify that it followed the 'corresponding rules or special instructions of the ICC for the rail express shipment of Class A explosives * * *,' (3) the shipments could be made to 'any military airport terminal' and from 'any joint military civil or civil airport in the United States if a prior agreement for its use has been reached between the Department of the Air Force and local civil airport management * * *.'
 
 
 27
 Based upon the undisputed facts before us, it is clear that Order S-712 had no application to the flight in question.[6] The Cordova flight did not originate in Tucson, Arizona or in any military-civil or civil airport, but from Iliamma Bay airstrip; nor was the Big Mountain airstrip an 'Air Defense Command Base' or a military airport terminal. Although Morrison-Knudsen was under a subconstract to the Air Force and the dynamite was the property of the United States Government, the airline's plane was not chartered by the Air Force 'for the exclusive purpose of transporting' the dynamite; the plane was at the disposal of Morrison-Knudsen for whatever purposes deemed necessary by it and this included carrying passengers, freight, and mail. Finally, there is nothing to show that the Air Force was connected with the flight or that it directed and controlled its exceution; no certificate was issued by the Air Force showing its compliance with ICC Regulations during the flight.
 
 
 28
 It is true that a 'Special Civil Air Regulation,' SR-417, was adopted on May 28, 1956, after the accident, authorizing Cordova, among other airlines, to transport Class 'A' explosives under the direction of Morrison-Knudsen in the latter's construction work on the same Alaska project that is involved here. Yet the regulation was not retroactive and appellee does not contend that it applies to the instant case; this new exemption only serves to strengthen our interpretation of the CAB and ICC Regulations, for it would appear unnecessary if Class 'A' explosives such as dynamite were not prohibited in the first place.
 
 
 29
 The second question raised is whether this violation of clause 1(c) of the policy must have in some way caused or contributed to the loss of the airplane in order to preclude recovery under the contract.
 
 
 30
 The key words of the clause provide: 'This * * * Policy does not cover * * * any loss * * * arising from * * * any flying in which a waiver * * * is required.' The basic issue is whether a violation of these terms suspends coverage under the policy so long as the violation exists or whether coverage continues until and unless the violation causes the loss or increases the risk of loss to such an extent that the coverage no longer applies. See, Travelers' Protective Ass'n of America v. Prinsen, 1934, 291 U.S. 576, 54 S.Ct. 502, 78 L.Ed. 999; Lineas Aereas Colombianas Expresas v. Travelers Fire Ins. Co., 5 Cir., 1958, 257 F.2d 150; Gulick v. Fidelity & Guaranty Ins. Corp., 1951, 13 Alaska 223.
 
 
 31
 Any conclusion must rest upon a construction of the words 'arising from,' which Cordova urges has interjected the requirement of causation into an otherwise standard exclusionary or suspension-of-coverage clause. We cannot impose such a delimiting construction on these words. It is well settled that the language in insurance contracts is to be construed by its usual and ordinary meaning so that a person of ordinary intelligence can understand that a particular hazard is not covered. Moyer v. Mut. Benefit Health & Acc. Ass'n, 1936, 9 Alaska 79, affirmed except as to attorney's fees in 9 Cir., 1938, 94 F.2d 906, 9 Alaska 235; N.Y. Life Ins. Co. v. Atkinson, 10 Cir., 1957, 241 F.2d 674. The word 'arising' connotes, in ordinary usage, something broader than causation; the Fifth Circuit has construed virtually identical language as follows:
 
 
 32
 "Arising out of' are words of much broader significance than 'caused by'. They are ordinarily understood to mean "originating from' 'having its origin in,' 'growing out of' or 'flowing from" or in short, 'incident to, or having connection with' * * *."
 
 
 33
 Red Ball Motor Freight, Inc. v. Employers Mutual Liability Ins. Co. of Wis., 5 Cir., 1951, 189 F.2d 374, 378; see also, Schmidt v. Utilities Ins. Co., 1944, 353 Mo. 213, 182 S.W.2d 181, 154 A.L.R. 1088; Minkov v. Reliance Ins. Co. of Philadelphia, 1959, 54 N.J.Super. 509, 149 A.2d 260.
 
 
 34
 Cordova's position would require a more severe construction of 'arising' and demand some causal relationship between the loss of the aircraft and the failure to obtain a waiver. But it is clear that Cordova could not mean actual causation, since it is highly improbable that the lack of authority from the Civil Aeronautics Authority could ever by itself cause the accident; as we understand Cordova's position, the loss must have 'resulted from' or been 'caused by' the carriage of dynamite without such waiver, and of course, since the dynamite did not explode, no causal connection has been established.
 
 
 35
 Yet this argument fails to give due emphasis to the entire clause: the policy does not exclude only those losses 'arising from the failure to obtain a waiver,' but 'any loss * * * arising from * * * any flying in which a waiver * * * is required.' The preposition 'from' has for its object 'any flying' which is in turn modified by the phrase, 'in which a waiver * * * is required.' The broad meaning attached to 'arising' requires that the clause be construed to exclude coverage when a loss is incurred by an insured aircraft which 'originates in,' 'grows out of' or 'flows from' any flight during which a waiver is required but not obtained from the Civil Aeronautics Authority. Under this construction, the coverage of the instant policy was suspended during the flight because the airline was required to but did not obtain a waiver.[7] See Bruce v. Lumbermen's Mutual Casualty Co., 4 Cir., 1955, 222 F.2d 642; Globe Indemnity Co. v. Hansen, 8 Cir., 1956, 231 F.2d 895; Des Marais v. Thomas, Sup.1955, 147 N.Y.S.2d 223, affirmed, 1956, 1 A.D.2d 1002, 153 N.Y.S.2d 532; Annotation, 9 A.L.R.2d 581.
 
 
 36
 Cordova argues in the alternative that the two diametrically opposed views of the parties to this action in respect to the clause in question demonstrates that the clause is ambiguous. If this were true, of course, we would be required under the usual rule of construction to construe the policy in favor of the insured and against the insurer. But we cannot agree that the language is ambiguous; this court has recently considered the question of ambiguity in construing the word 'possession' in an insurance contract, and the principles stated are particularly applicable here:
 
 
 37
 'When found in a contract courts make every attempt to give to ('possession') the meaning understood by the parties when entering into the contract. This is not always easy, but the problem doesn't even exist if the word, in its context, is not susceptible of two meanings. The question is not whether a word is ever ambiguous, but rather when is a word ambiguous?
 
 
 38
 'Ambiguity is not necessarily to be found in the fact that a word or phrase isolated from its context is susceptible of more than one meaning. As expressed by the Seventh Circuit in Hill v. Standard Mut. Casualty Co., 110 F.2d 1001, 1004:
 
 
 39
 "To find that a word or phrase isolated from its context is susceptible to more than one meaning, or that a word or phrase in its context is susceptible to one reasonable and one unreasonable meaning, does not spell ambiguity."
 
 
 40
 General Casualty Co. of America v. Azteca Films, Inc., 9 Cir., 1960, 278 F.2d 161, 167; see also, Matsuo Yoshida v. Liberty Mutual Ins. Co., 9 Cir., 1957, 240 F.2d 824.
 
 
 41
 We think that the words 'arising from,' when considered in the context of clause 1(c) as a whole, are susceptible of only one reasonable meaning and cannot be called ambiguous. Since our construction of the clause requires the conclusion, as a matter of law, that Cordova's breach of the policy suspended its coverage during the flight which resulted in the loss, it follows that the lower court erred in not directing a verdict in favor of appellant.
 
 
 42
 Judgment reversed and remanded with directions to enter judgment for the defendant.
 
 
 
 [1]
 Since the notice of appeal was filed on July 17, 1958, prior to the admission of Alaska as a State, we still have jurisdiction under the Alaska Enabling Act, Public Law 85-508, 72 Stat. 339, 48 U.S.C.A. preceding section 21 note
 
 
 [2]
 Appellant has preserved its right to receive judgment if the lower court erred in not granting the motion for a directed verdict by filing a timely motion for judgment notwithstanding the verdict as required by the Supreme Court's interpretation of Rule 50(b), Federal Rules of Civil Procedure, 28 U.S.C.A. Cone v. West Virginia Pulp & Paper Co., 1947, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849
 
 
 [3]
 The uncontroverted testimony of Mr. Merle K. Smith, President of Cordova Airlines, revealed that no appelication was made to the Civil Aeronautics Authority for a waiver to carry the dynamite on the aircraft
 
 
 [4]
 Section 49.10 through 49.18 of Title 14 provide the types of explosives which can be carried on passenger-aircraft; these include only Class C explosives and some Class B explosives, but no Class A explosives are mentioned
 
 
 [5]
 In addition to this letter, the photographs of the area where the plane crashed, show dynamite boxes marked with, 'Atlas Powder Company-- High Explosives,' and a report entitled, 'Over, Short and Damaged Report,' signed by a clerk for Morrison-Knudsen, was admitted in evidence over Cordova's objection; the 'remarks' included the statement that '16 cases of 40% Dynamite were tottally demolished and scattered over wide area after COA aircraft crashed on December 18, 1955.'
 
 
 [6]
 The lower court left the entire question of the meaning and applicability of this order to the jury under the following instruction: 'If you believe that '(the Order) contained blanket authority for the plaintiff to carry the dynamite without a specific written waiver then you must find for the plaintiff on this defense.' This was error, for where, as here, the document is unambiguous, its interpretation does not depend upon extrinsic evidence, and its applicability is not dependent upon disputed facts, the question was one of law for the court. See, Dale v. Preg, 9 Cir., 1953, 204 F.2d 434, 14 Alaska 299; Durand v. Heney, 1903, 33 Wash. 38, 73 P. 775; Keeter v. John Griffith, Inc., 1952, 40 Wash.2d 128, 241 P.2d 213; Annotation, 65 A.L.R. 648
 
 
 [7]
 We are not unmindful of the recent decision by the Fifth Circuit in Hall's Aero Spraying, Inc., v. Underwriters at Lloyd's London, 1960, 274 F.2d 527, where the court appeared to require causation between the breach of the insurance contract and the loss. However, that case dealt with an 'unlawful purpose' clause which might require different treatment in respect to a causal connection. See Annotation, 166 A.L.R. 1118. At any rate, since the court concluded that the aircraft in that case was not being used for an unlawful purpose, the causation requirement would appear to be obiter