## AMERICAN NAT. BANK v. CONTINENTAL CASUALTY CO.

### No. 6363.

Circuit Court of Appeals, Sixth Circuit.

April 13, 1934.

Jordan Stokes, Jr., and James C. R. McCall, Jr., both of Nashville, Tenn., for appellant.

Geo. H. Armistead, Jr., of Nashville, Tenn. (Trabue, Hume & Armistead and H. B. Shofner, all of Nashville, Tenn., on the brief), for appellee.

Before HICKS, HICKENLOOPER, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

This action was upon an accident policy issued to Harry Sudekum, who died while it was in force. Appellee is not liable if the insured committed suicide; and the issue is whether his death was so effected, or was caused by accidental means. Appellant, American National Bank, guardian for Har-

ryette Sudekum, the beneficiary, complains of a directed verdict against it.

The deceased was forty-two years old, five feet nine and three-tenths inches in height, and weighed one hundred and seventy-five pounds. He was happily married and lived with his wife and fifteen year old daughter, Harryette, at Nashville. He was secretary and general manager of the Crescent Amusement Company of that city. On November 25, 1930, he closed a contract with Warner Bros. Pictures, Inc., under which the stock of the Crescent Company would increase in value to about $270 a share and he himself would be employed at a salary of $18,000 a year.

In the fall of 1930, Nashville was the scene of several financial crashes. One of its largest banks had been taken over by another. One of the largest bond and brokerage houses in the South, with headquarters in Nashville, had failed. The Liberty Bank & Trust Company, in which deceased was a director and stockholder, had failed. This bank was a depository for state funds and to secure these deposits had executed bonds upon which the deceased was one of the sureties. Deceased owed a note for $6,500 due December 25, 1930, and another for $1,500 due in January, 1931. After his death the state alone presented a claim of over a million dollars against the estate; and the inheritance tax returns made by the administrator showed total claims of $1,218,146.90 filed against it.

A few days before his death Sudekum made a trip by automobile from Nashville to some of the theaters operated by his company in East Tennessee. Returning he encountered a heavy fog in the mountains and contracted neuralgia. He reached home on the morning of Friday, December 12, 1930, and was persuaded by his wife to remain in bed that day. His illness was not serious and the family activities were not greatly disturbed. The daughter, Harryette, spent Friday night away from home with a girl friend and left home again about noon on Saturday "to go to a show." Mrs. Sudekum had house guests on Friday night; and, though the deceased was still in bed, he had so fully recovered that she and her guests left the house on Saturday afternoon to go to an entertainment. By Saturday deceased had no further need for an electric heating pad which he had kept on his forehead on Friday; and at 3 p. m. when he called the house boy to bring him a glass of water he laughed and joked with the boy, seeming to be in no pain at all. He was last

seen alive about 4:15 or 4:30 p. m., Saturday, by Mrs. Helen Morris, a friend of the family, who visited him just before leaving with Mrs. Sudekum for the entertainment. She said that deceased seemed well and comfortable.

The house boy, Earl Rutledge, testified that about 6:45 p. m. he returned to the room to inquire of Sudekum what he would have for supper. He found the door closed, but that was not unusual. Opening it he first saw the deceased's feet on the floor, and looking farther, he "saw him lying on the floor with the cord that was used on the electric heating pad about his neck," in a noose, the other end of which was tied to the wires of an incomplete electric fixture protruding from the wall about five or five and one-half feet above the floor. He was clad only in a silk undershirt, his usual sleeping apparel; his body being exposed from the waist down. The body was in a semi-sitting posture with the head against the wall about ten inches above the floor, with the upper part of the body leaning at an angle of about forty-five degrees from the wall. The boy did not touch him but ran to call the daughter, Harryette, who had just returned, saying, "Your father has hung himself." According to his testimony he re-entered the room just ahead of her, grasped the plug of the heating pad where it was tied to the electric wires, and pulling with all his strength broke them so that deceased's head dropped to the floor. He stated that Harryette entered the room about the time he broke the cord. But she testified that she passed the house boy and ran into the room ahead of him and that her father's body was lying on the floor with the electric cord around his neck and with the head lying to one side and about ten or twelve inches above the floor. She further stated that her father's body was limp and relaxed and that she caught his head before telling the boy to cut the cord, and that after it was cut she rested her father's head in her lap and pulled off the cord, which she had no trouble in loosening, since it ran smoothly through the knot at his neck. She testified further as follows: "When I entered the room my father's body was at an angle with the wall and his shoulders were against the wall. His head was leaning forward on his chest and his shoulders were back against the wall. The cord about his neck was loose. I am certain of that. It was not tight at all. I think my father was dead at the time. The cord about his neck was not taut, it was easy to remove."

The testimony of these two witnesses is controlling as to the position and condition in which the body was found, for no others saw the deceased before the cord was severed and removed.

F. J. Clunan, a friend who was with Harryette and who entered the room soon after the body was discovered, testified that when he saw Sudekum "the cord was not about his neck"; that the buttocks of the body were about six or eight inches from the baseboard with the back against the wall; that he, Pollard Caldwell, who had been in the party with Mrs. Sudekum, and the house boy placed the body on the bed, after which he took Harryette downstairs. He then returned to find the house boy and Caldwell pumping Sudekum's arms to restore his breath, but "he was dead * * * his neck was purple all the way around."

The maid, Alberta Amos, saw the body before it was placed on the bed and said it was lying with the head just above the baseboard with the head and shoulders against the wall.

There seemed to be no question on that Saturday evening but that Sudekum had committed suicide. As stated, the house boy, when he called Harryette to the room, said, "Your father has hung himself," and when he met Mrs. Sudekum at the door he said that "Mr. Harry had killed himself." Accompanying the proofs of death sent appellee was a joint letter from three physicians, Dr. Buckner, Dr. Eve, and Dr. Sanders, which stated that at a post mortem held December 19, 1930, they found the following marks on the body: " * * * A narrow bruised line quite discolored around the neck. The line was about one-half inch in width. The bruising or discoloration was more marked at some places than at others. We also found on the left side of the neck just below the lower jaw a bruised spot a little wider than one-half inch and about one quarter of an inch long which passed upward and outward from the midline and this bruise was a little more marked than that around the neck. We found no evidence of an electric burn anywhere. We also found some bruises on his right leg just below the knee and one on the back of the left hand."

Mrs. Sudekum, who saw the body before it was placed on the bed, seemed to think the neck had been burned, for Mrs. Morris quoted her as saying, "Oh, that horrible burn."

One of the embalmers stated that the mark projecting from the mark of the cord around the neck seemed like a burned place similar to

an electric burn. The blood that he drained from the body he testified was abnormally dark, an indication that there had been an electric shock. The other embalmer testified to an old skinned place on the knee nearly healed and to a place on the left hand about the size of a dime. He said a mark on the chin to the side of the Adam's apple appeared to be a burn and was brown and parched looking.

An electrical expert testified that by the manner in which the plug of the heating pad cord was tied to the wires at the outlet it would have been possible when the cord was drawn tight for the wires to brush against the two prongs of the plug making a contact and causing the current to flow through the cord which was around the deceased's neck. He stated that the ends of the fine wire which were in the knot around deceased's neck were beaded as though an arc had jumped across which would probably have caused a shock. Tests, made afterward, showed 120 to 130 volts passing through the wires at the fixture. The expert said that this voltage was not supposed to be sufficient to kill a man, but he admitted that there was uncertainty about it. He also testified that different persons were more susceptible to shock than others and that certain parts of the body were more sensitive than others.

We think that the facts and circumstances permit of no other reasonable inference than that deceased intentionally destroyed himself. There was, therefore, no error in directing a verdict for appellee. Proctor v. Preferred Accident Ins. Co., 51 F.(2d) 15, 17 (C. C. A. 6) and cases there cited. There is no doubt that deceased carefully and firmly attached the cord of the heating pad to the electric wires on the wall in such manner that when the cord was pulled tight the electrical current would flow through it; that he made a noose with the other end of the cord and placed it around his neck so tightly that it contacted therewith; and that he was killed either by the current or by strangulation, or by both combined, just as he had prearranged.

Appellant advanced the theory of murder, but there was no evidence to support it. No intruder was seen and there was no evidence of the presence of one in the room or upon the premises. There was no basis for suspicion against the house boy. There was no evidence that deceased was attacked while on the bed, and it is pure fantasy to suppose that he could have been taken alive from the bed and the noose placed about his neck without leaving signs of a struggle.

A few weeks or so before his death one of his business associates had been found dead with a shoestring around his neck in a manner giving rise to the general belief that the man had strangled himself. There is evidence that deceased expressed doubts as to this theory, and on one occasion undertook to demonstrate with his necktie that one could not so choke himself to death. From this evidence, added to the further fact that deceased was of an experimental turn of mind, the theory was offered that at the time he met his death deceased was making a test to demonstrate, if possible, that his friend did not commit suicide. This is pure conjecture and there is no support for it in the record. It is inconceivable that deceased would conduct, in solitude, a pointless experiment of so dangerous a nature. Reasonable men do not so recklessly trifle with death.

On December 15, two days after the death of Sudekum, Dr. M. G. Buckner, as the attending physician, filed with the Department of Health of the State of Tennessee, Division of Vital Statistics, a death certificate in which he gave the cause of death as "suicide by strangulation."

On October 17, 1931, about eleven months later, the coroner held an inquest at which the jury found that Sudekum died as a result of external violence or homicide. The record of the inquest, together with the certificate of the coroner to the effect that the cause of death was probably homicidal, was likewise filed with the Bureau of Vital Statistics.

Before the case was called for trial in the District Court at 9 o'clock March 2, 1932, appellant was served with an injunction sued out by appellee in the state Chancery Court which prevented it from offering in evidence the coroner's record and certificate above referred to. Notwithstanding, appellant went to trial without asking for a postponement and without seeking to dissolve or modify the injunction. After verdict and judgment appellant moved for a new trial upon the ground that it should have been permitted to offer these records.

It is unnecessary to determine here whether such report and certificate would have been admissible if presented. This is a question concerning which there is much controversy. Equitable Life Assur. Soc. v. Stinnett, 13 F. (2d) 820, 822 (C. C. A. 6). It is sufficient to say that under the circumstances there was no abuse of judicial discretion in denying the motion for a new trial. It develops that there was no ground for the introduction of the report of the coroner's jury and the accompany-

ing coroner's certificate as a part of the record of the Bureau of Vital Statistics because in the injunction case referred to, Continental Cas. Co. v. Nashville & American Trust Co. et al., 61 S.W.(2d) 461, the Supreme Court of Tennessee held that these documents had no place in the record of the Bureau.

Judgment affirmed.*

* The late Judge HICKENLOOPER concurred in the conclusion above reached but died before the opinion was prepared.