EQUITABLE LIFE ASSUR. SOC. OF THE
UNITED STATES v. GUIOU et al.

No. 10726.

Circuit Court of Appeals, Eighth Circuit.

Dec. 30, 1936.
Rehearing Denied Jan. 20, 1937.

David A. Fitch, of Omaha, Neb. (Norris Brown and Ralph M. West, both of Omaha, Neb., on the brief), for appellant.

Edgar M. Morsman, III, of Omaha, Neb. (Henry E. Maxwell and Truman W. Morsman, both of Omaha, Neb., on the brief), for appellee Guiou.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

Mrs. Genevieve Baldwin Guiou, named beneficiary in a life insurance policy insuring the life of her son Charles B. Guiou, issued to him by the Equitable Life Assurance Society on July 7, 1934, brought this suit to recover on the policy for the son's death which occurred within the life of the policy on the 8th day of August, 1935. The insurance company defended on the ground of suicide within the following provision of the policy: "Self-destruction sane or insane, within two years, from the date of issue hereof, is a risk not assumed by the Society under this policy. In such an event the Society's liability shall be limited to an amount equal to the premiums actually paid." Liability for the premiums actually paid was admitted and they were tendered.

At the close of all the evidence taken on the trial of the case, the defendant moved for a directed verdict for want of evidence to sustain any other conclusion than self-destruction. The motion was denied, exception was preserved, and there was a verdict and judgment for the plaintiff. The insurance company has appealed and assigns error on the refusal to direct a verdict in its favor on the issue of suicide. The question before this court is whether there is any evidence upon which a verdict for the plaintiff might properly be found. Lumbra v. United States, 290 U. S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

It appears that the insured suffered an injury at his birth which resulted in spastic paralysis and caused him to be crippled throughout his lifetime. He walked clumsily and dragged his left leg (which was about two inches shorter than the right), with a sort of shuffle when he brought it forward, using it as a support and not for promotion when he walked. His left arm was also affected by the spastic paralysis and was drawn up, and he had very little use of his left arm or hand. There was some lack of co-ordination between the right and left side of his body so that he had "poor balance." He carried his head forward and a little bit to one side and was always clumsy and slow in his movements. From the time he was a little boy he had had many bad falls when playing or running and several years before his death had had a bad fall on the ice. Two or three months before he died he fell when getting out of a car. But insured had been reared with extraordinary care, always having had gymnasium work from the time he was a little boy and a man was employed who went out to his home and gave him setting-up exercises. He went through the course at the high school and attended Amherst College for four years. He finished his college work in the spring of 1934 and returned to his home in Omaha. At the time of his death, the year following, he was 23 years of age and his mother testified that for at least five

years prior to his death he had been very well physically outside of his lameness. It is particularly clear that he was very fond of walking and was accustomed to walk a great deal. His home was about two miles from the Sixteenth street business district in Omaha and he always walked down town. He had, to a great extent, gotten used to his handicaps and was an intelligent, educated man, and he was fully able to walk about wherever he wanted to go.

In July of 1934, after he got back from Amherst College, he was employed as a sort of secretary to a doctor until about Christmas of that year and from about February until July of the next year he found some employment at a "shelter" in the city. For that work he received a very small amount of remuneration and he had no other remunerative work from the time he got out of college up to the time of his death. In answer to the question to the mother, "Isn't it true, he felt despondent after he quit working down there (at the shelter)?" she answered, "I don't believe particularly so; he was very anxious to earn money."

It appears that during the period of a week or ten days before his death the insured was observed by a number of witnesses at different times to be walking by himself back and forth in the railroad passenger yards that extend from the end of the passenger sheds at the Union passenger station in Omaha eastward several blocks to the west approach of the railroad bridge that crosses the Missouri river. There are about fifteen passenger tracks in these yards, used by about eleven different railroad companies and the railroad traffic there is constant and heavy and there is no outside business there except railroad business. The railroad bed and tracks are carried across the north and south street called Seventh street upon a steel and concrete viaduct at an elevation of about 32 feet above the pavement of the street, and it was noticed by the witnesses that the insured walked back and forth across this viaduct a number of times and on several consecutive days. He would walk from the direction of the depot sheds to and across the viaduct and turn and cross back again. On the afternoon of the day before his death he was walking alone back and forth across the viaduct one of the witnesses says "safe to say a couple of dozen times."

Photographs of the viaduct are in evidence showing that the ends of the steel girders supporting it at either side of Seventh street are built into heavy concrete abutments erected parallel with the street at the edge of the sidewalks. These abutments slope to the level of the railroad grade and there is a flat concrete block at the top, adjacent to the concrete edge of the viaduct, which extends outward from the north edge of the viaduct about two feet. The north side of the viaduct is made safe for pedestrians by a heavy railing which extends the entire length of the viaduct across the street. It is constructed of large iron pipe set horizontally into posts of similar pipe which stand about 89 inches apart, the posts being bolted at the bottoms into the margin of concrete that extends from the west end of the viaduct to the east end on the north side. The bottom rail is not over seven inches and the top rail is three feet and two inches above the concrete margin of the viaduct. This railing is set back about seven inches from the north edge of the viaduct and far enough north from the railroad tracks to be safe for a pedestrian when a train is passing.

George M. Tallon testified that he was a signal man long in the employ of the Union Pacific Railroad Company having charge of the various signals in these railroad yards. He was one of the witnesses who observed the insured on the afternoon of the day before his death. He then saw the insured walking west alongside the railing on the north side of the viaduct. "He got to about the middle of the guard rail and looked at the men working, then looked back at the guard rail, and then back at the men and then walked off towards the depot (west)." About 9:30 o'clock the next morning the witness was up in the signal tower located in the yards at Sixth street and again saw the insured at the west end and on the north side of the Seventh street viaduct. The attention of the witness was attracted because a switch engine stopped and he wondered why they were stopping, and he saw the insured step out from the end of the cars. The witness went down from the tower and walked over and met the insured at the east end of the viaduct. He asked the insured where he was going, and received the answer, "I don't know." The witness then took the insured up to the Union Sta-

tion and instructed him how to get up on to the Tenth street viaduct and out of the railroad yards. The insured offered no resistance, but seemed to be very nervous. About an hour and a half later Mr. Tallon saw the insured back again in the yards. The witness was then across the tracks from the insured to the south and east. He saw the insured walk up to the west end of the guard rail on the north side of the viaduct; saw him walk about three steps past the end of the viaduct and turn around and walk back to the end. The witness then saw the insured get out on the cement block on the north and outside of the guard railing and "he started along that." The witness said he had "started toward the bridge (viaduct) and because I had taken him out of the yard I thought he might get scared when I walked that way, so I walked toward the tower in the opposite direction so I thought I would look over and if he was watching me I would circle around that way, and I looked over after walking approximately twenty steps and he was gone." The witness then ran to see what had happened and saw the insured lying down on the street level below, by the abutment on the sidewalk "lying with his head toward the north very close to the wall of the abutment." He had received injuries from which he died that same day.

We think the circumstances thus far narrated tend strongly to prove self-destruction. The insured had no business or occasion to be walking up and down in the railroad yards and back and forth across this viaduct. The danger of putting himself outside of the guard rail of the viaduct directly above the concrete sidewalk 32 feet below him was perfectly apparent and obvious to him, and his set determination to thrust himself out upon the edge of the abrupt declivity—returning back to it again an hour and a half after he had been taken off from it, suggests only a mind bent on self-destruction. The last sight the signal man had of him he was out beyond the protection of the guard rail; "he started along that" and when the witness looked again "he was gone." There would be little doubt that he went purposely if the evidence stopped there, but it does not.

Another witness, Belle Bardelos, was called, who testified that she had the insured in full view as he walked out upon the viaduct and back to the west end on the north side. She saw him look around towards the east and the west and she comments, "I guess he didn't see anybody." Then she saw him put himself outside of the safety of the railing. He made as though he would step down on to a ledge of the concrete abutment which is there near to the top; he changed his mind and, taking hold of the railing, with his back to the north, he moved along it towards the east on the narrow edge outside of the railing. He looked down (to the street) then to the east and west and then raised both arms up in the air and leaped backwards to his death. The witness screamed when she saw his fatal act and grabbed the telephone and called the police. The ambulance came, as the testimony indicates, in answer to her call.

So the case presented is one in which the circumstances point directly to self-destruction and a disinterested person, the only witness who saw what happened in the insured's last moments, says that he threw up his hands and leaped backward from the viaduct. Such testimony affords no basis for a conclusion of death from accidental causes, nor for the verdict against the insurance company.

Counsel for the mother have very ably and fully developed the imperfections in the testimony, particularly in that of the witness who saw the act of self-destruction committed. The witness may have been wrong as to the distance the insured moved along the guard rail of the viaduct before he threw up his hands and leaped backward. The insured used his left hand so little he may not have grasped the railing with both hands, as she described. His left arm was in such condition that he may not have thrown it into the air along with the right arm. On cross-examination as to the force of the backward leap of insured, she answered the cross-examiner's question, "How high up would you say he leaped?" answer, "Oh, about two inches, not very much, two inches or three inches." And that is said to be improbable. The exact distance from the witness to the viaduct was not measured. But there is no indication that the witness was interested or biased or mistaken as to the fact that she saw the man deliberately put himself in position to leap clear, and saw him make the leap. Her scream attracted her mother to her side and her telephone call appears to have brought the police to the spot where he was lying. Slight imperfec-

tions, if such there were in her testimony, would certainly not of themselves support the claim that there was no such voluntary act as the act she saw and testified to. Mutual Life Ins. Co. v. Gregg (C.C.A.6) 32 F.(2d) 567.

The possibility that the insured's physical handicaps caused him to accidentally fall from the viaduct has been well argued, but is refuted by the evidence that the insured (well knowing his handicaps) thoroughly acquainted himself with the conditions at the end of the viaduct by walking back and forth and looking at the place time after time. He knew not only its dangers but the means it afforded to accomplish his clearly manifested purpose by merely stepping out beyond the safety of the railing, moving clear of the wall, and leaping.

■ There was testimony that from his youth up the insured enjoyed watching the movement of trains, but that interest furnishes no explanation of his conduct at and prior to the time when he came to his death. It was also brought out that there was a geodetic survey mark embedded in the concrete block adjacent to and level with the north edge of the viaduct where the insured stepped outside the guard rail. He might have been curious to look at that. But verdicts must be rested upon substantial evidence and vague possibilities conjured up or conjectured by fertile minds do not suffice. Love v. New York Life Ins. Co. (C.C.A.5) 64 F.(2d) 829; New York Life Ins. Co. v. Trimble (C.C.A.5) 69 F.(2d) 849; New York Life Ins. Co. v. Doerksen (C.C.A.10) 75 F.(2d) 96; Sears, Roebuck & Co. v. Peterson (C.C.A.) 76 F.(2d) 243.

■ We think the evidence permits of but one conclusion, self-destruction within the meaning of the policy. Miller v. Travelers Ins. Co., 80 F.(2d) 503 (C.C.A.7); Travelers' Ins. Co. v. Miller (C.C.A.) 62 F.(2d) 910; American Nat. Bank v. Continental Casualty Co. (C.C.A.6) 70 F.(2d) 97; Love v. New York Life Ins. Co., supra; Burkett v. New York Life Ins. Co. (C.C.A.9) 56 F.(2d) 105; Wirthlin v. Mutual Life Ins. Co. (C.C.A.10) 56 F.(2d) 137, 86 A.L.R. 138; Frankel v. New York Life Ins. Co. (C.C.A.10) 51 F.(2d) 933; Proctor v. Preferred Accident Ins. Co. (C.C.A.6) 51 F.(2d) 15; Mutual Life Ins. Co. v. Gregg, supra; New York Life Ins. Co. v. Alman (C.C.A.5) 22 F.(2d) 98, cer-

tiorari denied 277 U.S. '586, 48 S.Ct. 433, 72 L.Ed. 1000; Aetna Life Ins. Co. v. Tooley (C.C.A.5) 16 F.(2d) 243; Planters' Bank of Tunica, Miss., v. New York Life Ins. Co. (C.C.A.5) 11 F.(2d) 602, 603; Von Crome v. Travelers' Ins. Co. (C.C.A. 8) 11 F.(2d) 350; New York Life Ins. Co. v. Weaver (C.C.A.5) 8 F.(2d) 680; Del Vecchio v. Bowers, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229.

In view of our conclusion, other errors assigned need not be discussed.

Reversed and remanded.