GLOBE INDEMNITY COMPANY, a
Corporation, Appellant,

v.

Harland HANSEN, Special Administrator
of the Estate of Kenneth Nielsen,
Deceased, Appellee.

No. 15327.

United States Court of Appeals
Eighth Circuit.

March 22, 1956.

F. H. Durham, Minneapolis, Minn. (Durham, Swanson & Lasley, Minneapolis, Minn., on the brief), for appellant.

Robert J. Sheran, Mankato, Minn. (Gallagher, Farrish, Sheran & Zimmerman, Mankato, Minn., on the brief), for appellee.

Before STONE, WOODROUGH and VOGEL, Circuit Judges.

STONE, Circuit Judge.

The appellant, Globe Indemnity Company, issued a liability policy to Dean Lowe (d/b/a Mankato Aero Service), owner and operator of an airplane rental business. The policy expressly covered "not only the named insured but also any person while using or riding in the aircraft * * * provided the actual use is with the permission of the named insured." March 27, 1953, Kenneth Nielsen (a licensed pilot) rented an airplane from Lowe and took up with him three passengers for a short pleasure flight. After the plane had been in the air some time, it crashed, killing all four.

There resulted various State Court suits by separate representatives of each of the passengers against Lowe and against the estate of Nielsen.[1] The Indemnity Company was not a party to any of these suits. In those passenger suits, negligence was charged against Lowe in renting an unsafe plane, and against Nielsen for negligent operation thereof. During trial, the three passenger cases were settled. One result of these settlements was that Nielsen's estate was obligated to pay $7500.00 to be realized from certain described property.[2] The present action is by the Nielsen administrator against the Indemnity Company for recovery of the above $7500.00 with $2500.00 to cover expenses in these litigations. The policy coverage of Nielsen is based upon the above quoted "omnibus" provisions of the policy and such inclusion is conceded by appellant.

The theory of the petition is that a fiduciary relationship existed between Nielsen and defendant under which defendant was obligated to investigate the facts of the accident, to acquaint Nielsen therewith and to defend the actions brought by the passengers against Nielsen; that defendant promptly made an "extensive" investigation and assumed defense of Lowe in those suits on the ground that the accident came within exclusion provisions of the policy which would result in placing legal blame upon Nielsen; that it was not until the negotiations for the settlements, during the trial, that plaintiff discovered that a policy existed covering Nielsen; that, thereupon, plaintiff immediately tendered defense of the actions and asked defendant to assume responsibility for any settlement—both of which were refused by defendant; that, because of the foregoing, defendant is estopped from denying policy coverage of plaintiff and reliance upon any exclusionary clause in the policy.

The amended answer pleaded violation by plaintiff of Minnesota laws and regulations and of the Civil Aeronautics Board regulations applying to aerobatics and minimum safe altitudes and also by aerobatics at a lower altitude than 1000 feet—all being excluded by the policy.

The reply denied this answer and pleaded invalidity of these exclusion provisions as "contrary to public policy".

The case was tried to the Court, who made findings of fact and stated conclusions of law. Thereon, judgment was entered for $7500.00 with interest from the date when plaintiff tendered to de-

[1] Also, the administrator for Nielsen's estate brought suit against Lowe; and Lowe brought suit against that administrator for loss of the plane.

[2] It appears that the Indemnity Company assumed and conducted the defense of these suits in so far as they were against Lowe; and that it paid—in this relationship—for settlement of two of the three passenger cases, the third suit settlement being taken care of by the Nielsen estate.

fendant the defense of the passenger suits and for $1500.00 to reimburse plaintiff "for attorney's fees expended" in the defense of said actions. From that judgment defendant appeals.

Appellant relies upon claimed errors as follows: (1) Certain Findings of Fact and Conclusions of Law; and (2) exclusion of three specified pieces of evidence.

Findings and Conclusions.

Appellant challenges four Findings. A summary of these Findings follows: that defendant, as an "agent" of Nielsen (under the policy), was charged with investigating the accident and conducting the defense for appellee in the passenger suits and failed so to do "without justification"; that the $7500.00 settlement made by plaintiff was reasonable; that "the accident to said airplane was caused by mechanical failure, defects therein, or malfunction thereof, or by errors of judgment on the part of said Kenneth Nielsen, and not by acts deliberately and intentionally committed by him"; and that defendant failed to sustain the burden of proof of a violation of any of the exclusionary provisions of the policy.

The challenged Conclusions are, in effect, as follows: that, under the policy, defendant was obligated to disclose to Nielsen the existence of the policy and to defend the passenger suits against his estate, which obligation was violated and the policy contract breached without justification; and that, thereby, plaintiff was entitled to recover the $7500.00 which he was obligated to pay under the settlements.

Appellant's attack upon these specified Findings and Conclusions is stated by its counsel under three headings: "(1) The cause of the crash and its bearing upon the policy exclusions; (2) whether the settlement was binding upon defendant, and (3) defendant's duty and relation-

ship to the pilot's estate as an additional assured".

(1) *Cause of crash and its bearing upon the policy exclusions.* The vital issues are whether, at the time of the crash, Nielsen was indulging in aerobatics; and whether the Indemnity Company is estopped to rely upon the policy exclusionary provisions. We consider these issues in this order: first as to the exclusionary provisions and next as to estoppel.

█ If Nielsen was then indulging in aerobatics, he was acting within the exclusion provisions of the policy and, therefore, had thereby put himself beyond its protection. It is not necessary, under Minnesota law, that the policy excluded acts caused the accident. The rule in Minnesota is clearly expressed in Giacomo v. State Farm Mutual Auto Insurance Company, 203 Minn. 185, 280 N.W. 653. This rule is "that where there has been no assumption of the risk by the insurer, there can be no liability is elementary", 280 N.W. at page 655; and "The exclusion is based on contract, which excludes this risk without regard to causal connection." 280 N.W. at page 656. Also see Riteway Carriers, Inc., v. Stuyvesant Ins. Co., D.C.Minn., 114 F. Supp. 507, 510, 511.[3]

The trial court found that this accident "was caused * * * not by acts deliberately and intentionally committed by him [Nielsen]" (Finding XV); and that defendant (appellant) "failed to show and prove the violation by plaintiff's decedent [Nielsen] of any of the exclusionary provisions of said policy * * *" (Finding XVI). It is the verity of these Findings which is this immediate issue.

The policy exclusions relied upon by appellant are "violation of any governmental regulation * * * applying to aerobatics * * * minimum safe alti-

3. The decided weight of authority in other jurisdictions is to the same effect. Travelers Protective Association of America v. Prinsen, 291 U.S. 576, 581, 54 S.Ct. 502, 78 L.Ed. 999; Bruce v. Lumbermens Mutual Casualty Company, 4 Cir., 222 F. 2d 642, 645. See numerous cases, dealing with various exclusion provisions, collected in annotations beginning on the pages following: 118 A.L.R. 393; 115 A.L.R. 827; 105 A.L.R. 1426; 95 A.L.R. 150; 72 A.L.R. 1070; and 46 A.L.R. 550.

tudes \* \* \* [or] performs or attempts to perform aerobatics during which the aircraft is intentionally operated at an altitude of less than 1000 feet above the terrain \* \* \* ".

The pertinent governmental regulations are as follows:

" § 43.48 Aerobatic flight. No pilot shall intentionally fly an aircraft in aerobatic flight carrying passengers unless all occupants are equipped with approved parachutes."

"60.106 Acrobatic Flight. No person shall engage in acrobatic flight:

"d. Below an altitude of 1500 feet above the surface."

"60.107 Minimum Safe Altitudes. Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:

"a. Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface."

### Definitions.

"15.1 Acrobatic Flight. Maneuvers intentionally performed by an aircraft involving an abrupt change in its attitude, an abnormal attitude, or an abnormal acceleration."

The Minnesota statutes, M.S.A. § 360.-075, make it a misdemeanor to engage "in acrobatic or stunt flying without being equipped with a parachute and without providing any other occupants of the aircraft with parachutes and requiring that they be worn".

■ With the above Regulations and the Minnesota Statute in mind, we examine the evidence to determine whether the trial court is or is not supported by substantial evidence in deciding that the appellant failed in its burden of proof that the pilot engaged in aerobatics at the time of the accident. In so doing, we apply the rule that we do not retry matters of fact but confine ourselves to determining the question of law as to whether there is or is not any substantial evidence to support the findings of fact by the trial court—viewing the evidence in the light most favorable to sustaining the Judgment. Kaiser Motors Corporation v. Savage, this Circuit, 229 F.2d 525; and see Greenspon v. Commissioner of Internal Revenue (and related cases), this Circuit, 229 F.2d 947.

■ This plane was a Cessna 170 single engine, with seats for four persons—the front seat was for the pilot (left side) and one other, immediately behind was a seat for two persons. It was the color of silver or aluminum. The plane was not equipped with any parachutes. The afternoon of March 27, 1953, Nielsen came, with three friends, and rented the plane to go "for a pleasure ride" with his friends. He was a qualified pilot. The attendant checked the gas tanks, oil and tires. He and Nielsen together walked around the plane checking and testing the "service controls". Nielsen got into the pilot's seat and took off at about 5:15 p. m. Sometime between 5:30 and 6:00 p. m., the plane crashed in a small grove of trees not far from the town of Minnesota Lake, killing all four occupants.

The testimony as to what the pilot was doing with the plane shortly before and immediately before the crash comes from two sources: the eyewitnesses who observed the plane and certain deductions drawn from inspection of the wrecked plane. There were three eyewitnesses to the maneuvers of the plane shortly and immediately before it crashed. They were Ernest Meyer, Charles Latusick and Erick J. Brandt. Because of the vital importance of and because the testimony of each of these three is so briefly and concisely abstracted that the essentials thereof—as bearing on this immediate issue is concerned—are best understood by setting out their testimony in full; this we do in the footnote.[4]

---

4. "My name is Ernest Meyer. I live 5 miles north and 2 miles east of Bricelyn, Minnesota. I saw a crash of a plane on March 27, 1953. I was called as a witness in the case at Mankato, Minnesota and was called by Mr. Ogle. I was

The testimony based on inspection of the wrecked plane came from two witnesses: Allen W. DeVoe and Dean V. Lowe. Mr. DeVoe was an Aviation Safety Agent of the Civil Aeronautic Administration. A part of his duties was in-

just going home from Mankato and was going through Minnesota Lake. When I first saw the plane, it was southeast of me. It was flying level and then first thing I knew, it was diving down. The time was between 5:30 and 6:00. I will say the plane was between three-quarters of a mile and a mile up. The plane dove at an angle of about 45 degrees. It came 'awful close to the ground'. The plane came within 50 feet of the ground and I saw either dust or smoke when it took off again and went up in the air, then leveled off again, then dove down again and the further he went down, the faster he went. I could not hear the motor of the plane as I had the motor of my car running. I saw the plane crash. Both dives were made in about the same manner from about the same height.

"The first observations I made of the plane were when I was in my automobile. I was driving in a general southeasterly direction. I was just coming through the Village of Minnesota Lake when I first saw the plane. It was between 5:30 and 6:00 in the evening. I kept the plane in constant view from the time I first saw it until it crashed. I don't think I was any closer to the plane than one-half mile. I was driving awfully slow. The plane was off to my left in a generally easterly direction. At the place where the plane came near the ground the first time, there were no obstructions or trees of any kind. I couldn't say exactly the number of feet he was from the ground but he came awfully close. The windows on my side of the car were down. I do not have a radio. I did not hear the motor of the plane nor could I see the identity of the driver. I could not identify the plane as to type or kind. It was a small plane. Many small planes fly in that area. The place where the plane crashed was about a mile away from me. The plane was not in the general direction that it was when I first saw it. It was travelling northeast. My car was standing still at the time the plane crashed. It crashed sideways from me. I saw the plane hit the grove of trees. I did not hear the motor operating as it descended into the trees. I was sitting in my car at the time. My hearing is normal. There were no unusual weather conditions. This dust or smoke I saw when the plane started to rise the first time was black or bluish black. I do not know whether it was smoke or dust. It came from the rear of the plane. There wasn't much the first time but when he crashed, there was really a dark cloud. That was the only crash that occurred in that vicinity that day. I was the second car at the scene of the accident. None of the bodies were in the plane. The body farthest from the plane was 40 to 50 feet. The one closest was about 20 feet. The engine was lying south from where the plane was, about 50 or 75 feet. The plane entered the grove of trees from the north or northwest.

"The second dive was from about the same height as the first dive. The dives were made from three-quarters of a mile to a mile up. They were made from a 45-degree angle. In the last dive he went faster. I am just guessing when I say the plane was about three-quarters of a mile high. I have had no experience along that line. The plane was higher than a quarter of a mile but I am guessing at that. I am quite sure the plane descended, however, at a 45-degree angle. Plaintiff's Exhibit 8 was offered and received [The witness indicated thereon a line of descent approximately 45 degrees to the outer edge of four vertical lines representing the grove of trees]. It is a sketch showing a right angle with the bottom line marked 'ground' and the witness was asked to indicate on it the angle of descent of the plane. It was received without objection.

"As a farmer, I have had considerable experience in estimating distances on the ground such as half sections, quarter sections, etc.

"I am a farmer and my farm is located about eight miles south and two miles west of Wells. I travel this highway a good deal. I am 50 years old. I went to the 5th grade. I was driving a 1934 Dodge. It was in about as good condition as a fellow could expect for that model car. The motor made much noise. I was driving on a level highway. I was moving when I first saw the plane but then I stopped my car but not the motor. The engine was running and it rattled."

"My name is Charles Latusick. I testified in the State Court at Mankato last winter. I was called as a witness by Mr. Ogle. I live on the east end of the town of Minnesota Lake. On March 27, 1953, I saw an airplane crash. The crash occurred on what is known as the Putz farm. I first saw the plane when I got out of my truck near the railroad tracks

spection of airplane crashes. He made such inspection of this wreck on the morning following. As to this witness, the Court felt constrained, by Section 701(e) of the Aviation Act, 49 U.S.C.A. § 581, to limit his testimony "to what he

in the town of Minnesota Lake. It was around 6:00 or after when I first saw the plane. It was then flying straight ahead. Just before I saw the plane crash, I saw it make a dive. I was going home and was near my house and I looked up and seen it. I don't know what made me look. All at once it made a dive and then I stood and watched it. I could hear the engine. It was roaring. The plane was about three-quarters of a mile high when it started to dive. Just before it took this dive, it was flying level. Before this, I saw the plane flying around Minnesota Lake about a couple hundred feet above the ground. It was similar to the plane shown in Defendant's Exhibit H. [Photograph of a Cessna plane like the one in the accident] The plane that crashed looked like the same plane I saw flying around Minnesota Lake and the plane that crashed also looked like the plane in Exhibit H. I saw the plane flying around Minnesota Lake about 10 or 12 minutes before the crash. I was walking at the time. I had walked about three or four blocks from the time I saw the plane flying over Minnesota Lake until it crashed and that was about a period of 10 minutes. The plane dove at an angle of 45 degrees. I went over to the scene of the crash. I knew the two Nielsens and Roessler.

"When I first saw the plane I was right next to the railroad tracks in the Village of Minnesota Lake. There are about 500 or 600 people living in Minnesota Lake. I do carpenter work and went to school to about the 7th grade and I also worked on a farm. I think the plane I saw had one propeller but I don't know for sure whether it was a single engine plane or a double engine plane or whether it was a pleasure plane or a commercial plane. The plane was shiny and had kind of a silver color. I didn't pay much attention to it but you could see it was kind of silver colored.

"Q. (By Mr. Sheran) Well, now, whether the plane you noticed the second time was the same plane that you noticed the first time is something about which you have no way of knowing one way or the other, isn't that true? A. Yes.

"Q. You have no idea as to whether it was or was not the same plane, isn't that true? A. That's right.

"There are a lot of planes that fly in the vicinity of Minnesota Lake and it is not uncommon for me to see one or more planes in the air near the village. I do not fly an airplane but I have been up in them. The reason I set the figure at 200 feet is that we have a water tower in the town which is 120 feet high and I used that in estimating the height at 200 feet. I was about three quarters of a mile from where the plane crashed and was standing in the road. The plane was straight east of me. I did not see the plane come in contact with the trees. It disappeared before it hit the trees. It was right about the trees when it disappeared. I could see the grove of trees from where I was standing. I did not see any smoke come out of the plane just before it disappeared nor did I see any smoke come out of plane at any time. I did not see any debris or dust of any kind when the plane disappeared in the trees. I did not hear the motor during the interval of the few seconds between the time the plane disappeared and the time I heard the crash."

"My name is Erick Brandt. I live two miles south of Minnesota Lake and I am a farmer. I also testified in the case at Mankato last winter. I was called by Mr. Ogle. I saw the plane crash. I first saw the plane about a mile and a quarter from the place where it crashed. I was standing in the barn looking out. My barn is about a mile and a quarter from the place where I first saw the plane. When I first saw the plane, it was flying level about half a mile up. It was in the late afternoon. I could hear the motor. When I first observed it, it was flying north on the level and then it made a left turn toward the west and then came back to the south and made a dive. I cannot give the angle of the dive because I was facing it. It went into a grove of trees and I then lost sight of the plane. I heard the motor during all the time that I saw it. It was in operation during all that time.

"I saw the plane come in contact with the trees. The trees were about two miles from where I was standing. I was looking north and a little east. There was no obstruction from my seeing the plane until it came into contact with the trees. I observed the plane for about three minutes. I watched it continuously during that period. The closest it came to me was about a mile and a quarter. That would be on a straight line on the land. I did not notice any smoke coming out of the plane just before it hit the trees or anything that looked like smoke. When it crashed, there was what

saw, his observations, but he can't testify to opinions". The pertinent portions of the admitted testimony as to our issue now being examined are quoted in footnote[5].

Mr. Lowe testified he had purchased the plane (then second handed) in July, 1953, after a thorough inspection by him and by his mechanic who was "a designated C.C.A. inspector" and the "logs" of that and periodic subsequent inspections (as required by law) were introduced. He had been a pilot for eleven years, and besides running an airport, was an instructor. He arrived at the place of the accident about two hours afterwards. The pertinent portions to our immediate issue are set forth or referred to in footnote[6].

---

appeared to be smoke or dust. I did not notice that there was an interval of a few seconds before the crash when the sound of the motor was not heard. In fact, it roared all the way down. There were three or four seconds after I saw the crash that I heard the roar of the motor. This is because sound only travels at 1,100 feet a second and it took that long for the sound to travel after I saw the crash. I am quite sure that I heard the sound of the motor that long."

5. "On arrival, I found that the aircraft had contacted a wooded area at an angle estimated to be between 20 and 30 degrees and that it had torn through about 200 feet of this wooded area, leaving some parts in the trees and parts scattered all along the path of the aircraft there, and that the fuselage or main body of the aircraft had stopped on the edge of the woods with the engine a little further on. Our first attempt was to locate all of the parts, the major parts of the aircraft, which we were able to do by identifying the various parts or sections of them, and from thereon, to determine as far as possible whether or not there had been any failure prior to the accident. By that, we were looking for any cracks that would show evidence of age in any of the control system or major structural parts of the airplane. We examined the entire control system for its condition and connection to the appropriate parts. We examined the engine and propeller. We checked all of the control cables.

"The elevator cables and rudder cables were intact and still attached to their appropriate control horns. The aileron cables to the aileron on the right wing were still attached and were in good condition. The cables for the left aileron were still attached to their appropriate horns, but—the cables themselves were broken at about the attachment point of the wing to the fuselage. In this case, the wing itself has been completely torn off from the aircraft."

*      *      *      *      *

"I believe there was one fact that we had covered in the other hearing that may be appropriate here, and that is the condition of the propeller. I covered that at some length at that time.

"Q. (By Mr. Durham) Yes, I was going to ask you that. A. The propeller showed very definite and deep scratches and cuts along the leading edge of the blade, and one blade was bent backward in the plane of rotation."

Under the Court's ruling, his answer that "the power was being developed at the time of contact with the trees or ground" was stricken.

6. "I had piloted this plane many times before the accident. I also had piloted it the day before. It operated very well. I went out to the scene of the accident that evening and the following day. I did not make as detailed an inspection as Mr. DeVoe did. I took particular note of the propeller. It contracted [contacted] the ground at a terrific rate of speed. The blades were bent back and the tips were bent forward. In my flying experience, I have had occasion to examine and see propellers where they hit the ground or an object while the plane is in motion and the propellers are in motion and from my experience, I am able to tell from the looks of a propeller whether or not the motor was revolving at the time the plane crashed.

"I have seen quite a few bent propellers, roughly about 50 and they follow a pattern. Of the 50 I have seen, probably not over three were occasions when I witnessed the accident itself and the last one I witnessed was perhaps the year before. 1 have made these observations over a period of about eight years. As I say, the bent propellers follow a pattern. If the airplane should come in with its gear up and the engine running, the propeller will bend a certain way and if it comes in with the engine not running, it will bend a certain way. I have also observed bent propellers where the propeller wasn't moving. I have never seen any propellers bent while flying in the air. Even if a propeller struck a bird in the air, it would not bend it although if it were a wooden propeller,

In considering this evidence, two things must be kept in mind. The first is that much of it is concerned with the cause of the accident in the sense that there was a sharp issue as to whether the accident was caused by some failure of

it might break it. Based upon my experience, I could tell whether the engine was running when the airplane came in contact with the trees. These signs are that the blades were bent slightly back and the tips were bent forward again which showed that the propeller was turning at great speed. I do not believe that it is possible to get this double bend except when the propeller comes in contact with a stationary object at great speed. The fact that this plane struck this grove of trees would not cause this same bend if the propeller were not moving because the engine will stop as soon as the propeller contacts anything. I am insured by the defendant in this action. There is also an action pending in which I am plaintiff and in which the Kenneth Nielsen estate is defendant wherein I am seeking to recover the damage to the plane.

"From the inspection which I made after the accident, I am of the opinion that the propeller was turning fast at the time of the crash. *I heard the testimony about the two dives that the plane made and I do not believe the plane could go up to an elevation of three-quarters of a mile again after the first dive with the motor dead* [Italics added]."

\* \* \* \* \*

"Well, it seems to me he was diving at the ground and pulling up; in this case, I think, he misjudged the pull-out, misjudged his rate of speed and didn't start to pull out soon enough, and flew into the ground."

\* \* \* \* \*

"I arrived at the scene of the accident about two hours after it occurred. After the C.A.A. people had examined the wreckage and released it—either March 28 or March 29—the engine was hauled to my airport at Mankato and has been in my possession at all times since. The engine has never been subjected to scientific examination in an effort to determine whether there was anything about the engine that might have been related to the occurrence of the accident.

"The Continental Company, manufacturer of the engine, has experts who are available to examine engines following the occurrence of airplane accidents and give a report as to their findings. In the Navy, it is the general practice, where there is any question as to the cause of the accident, to collect the parts of the plane and subject them to intensive tech-

nical analysis in an effort to ascertain the presence or absence of a defect in the plane which might have relationship to the accident. However, the wreckage of the plane involved in this accident was not subjected to technical analysis, but on or about March 29, was collected and taken to a junk dealer in Minnesota Lake.

"The Cessna 170 involved in this accident was equipped with dual controls so that it could be operated with equal facility by either person riding in the front seat. At about 5:00 P. M. on the date of the accident, I saw Kenneth Nielsen and three other persons, two of whom were riding in the front seat and two of whom were riding in the back seat, leave the Mankato Airport in the Cessna 170. This plane had been rented to Nielsen previously on a number of occasions. He had operated planes owned by me for some period of time, on occasions when I was with him and on other occasions when I was not with him.

"As of the date of the accident, I had sufficient confidence in the ability of Kenneth Nielsen as a plane operator so that I was willing to entrust the plane, having an approximate value of $3000.00, to Nielsen in exchange for a rental fee of $12.00 per hour.

"You can't assume a dead engine on a downward flight and come to the conclusion that I came to with respect to the propeller.

"Q. And you can't assume as true the testimony of one witness who testified that there was a period of about three or four seconds before impact when the motor could not be heard and come to the conclusion that you came to?

"Mr. Durham: If the Court please, I think that assumes just one particular phase. Mr. Brandt here says, of course, the eyesight is quicker than the hearing, and, of course, there was a lag there. If he couples that testimony there, I have no objection.

"Mr. Sheran: I am not referring to Mr. Brandt's testimony now. I am referring to Mr. Latuscik's testimony.

"The Witness: No.

"I think you could accept as true the testimony of a man standing two miles from the point of impact that he heard a motor roaring for four seconds after he saw the impact and come to the conclusion that I did. While the engine probably stopped almost immediately, the plane was going at such a terrific rate of speed that to go 200 feet would take

or defect in the plane or was caused by some failure or misjudgment on the part of the pilot. Either or both causes might be admitted without affecting the issue we are now considering, which is whether the pilot was so operating the plane as to put him within the express exclusions of the coverage of the policy. The second thing is whether the weight of the evidence clearly is against the finding that defendant failed to sustain the burden of proof that the accident "happened as a result of or during the course of the violation of any State law

only a fraction of a second I would imagine. The propeller probably shot through the tops of those trees and got most of that bend when it contacted the ground. The engine did hit an oak tree about 12 inches in diameter and carried it 50 to 75 feet. The propeller was attached to the engine when I saw it following the accident. The plane dipped into the grove of trees at an angle of 30 degrees. It looked like it hit the oak tree fairly close to the edge of the grove and the momentum tore the engine out of the aircraft and the engine and propeller ended up in a plowed field and was carried for a distance of 40 feet. I couldn't say whether it was rolling or was thrown there. I definitely feel that looking at the propeller with the bend in it that I could come to the conclusion that I did. It is possible for this propeller to continue to revolve even with the motor shut off, that is, the action of the air on the propeller in a fast descent could make the propeller twist around even though it was not powered by the motor. The line of descent as drawn on Exhibit 8 would be inconsistent with the theory which I have expressed because the line of flight should curve as it approaches the trees. It would be conjectural to conclude that if the line of flight was a direct 45 degree angle that the operator of the plane either did not or was not able to level the plane off as it came near the ground. The instinct of self-preservation would induce him to pull backward on the stick to avoid a crash.

"Q. So that if it's true that the plane went on a straight diagonal into the trees, it would indicate either that the person who was operating the plane was intent upon committing suicide or that he was unable to regulate the plane, would it not? A. Not unless he completely misjudged it. As I see it, the people say he went in at 45 degrees on a dive, and the C.A.A. in their records show that the trees were cut at an angle of about 30. So I would think that he was in the process of pulling out.

"Q. Yes, we will come to that in a moment, but let's assume for the moment that the men who made the observa-

tions were correctly reporting what they saw to the effect that he went into those trees on a straight 45-degree angle without any curve at the end of the downward descent. Now, isn't it true that the only possible way that you could explain an occurrence of that kind is either that the person operating the plane was intent upon committing suicide, or that there had been a loss of operating control so far as mechanics of the plane were concerned? A. If that's what happened.

"Q. If that's what happened, that is true, is it not? A. (nodded yes.)

"My testimony is based upon the evidence of the witnesses that the original descent was 45 degrees and the estimate of the C.A.A. inspector that the flight through the trees was approximately 30 degrees. If the plane entered the grove of trees at a 45-degree angle, it would strike the trees nose first. The plane had attained such speed that hitting the tops of those few trees would have a tendency to deflect the plane and level it off even though there was no attempt to level off on the part of the pilot. Exhibits 9 and 10 were offered and received. Referring to Exhibits 9 and 10, the plane contacted the grove near the edge and came to rest right on the edge so it only hit the tops of a few trees, then contacted the oak tree. Actually, the plane didn't go through 20 or 30 trees such as pictured in these exhibits. It is hard to say how many trees the plane came in contact with. It went 200 feet from the time it started hitting the tops of the trees until it struck the ground at a 30 degree angle. Exhibits 9 and 10 were received without objection."

Appellee filed a Supplemental Record which is a verbatim portion of the cross-examination of witness Lowe. This testimony has a bearing upon whether the accident might have been caused by some defect in the plane which disabled the pilot from pulling out of the last dive, but it does not weaken the evidence of the three eyewitnesses as to making the two dives from level flight (seen by Meyer) or the last dive from level flight (seen by all three).

or governmental regulations applying to aerobatics or minimum safe altitudes or during the course of aerobatics while said aircraft was being intentionally operated at an altitude of less than 1,000 feet above the terrain, or of any other governmental regulation pertaining to the operation of said aircraft."

We think there was no substantial evidence to sustain this Finding and the Court should, therefore, have found the opposite. Compare Equitable Life Assurance Society v. Guiou, 8 Cir., 86 F.2d 865.

The amended answer presents this issue clearly: "that the accident was due to the pilot's violation of the laws and regulations of the State of Minnesota and the Civil Aeronautics Board applying to aerobatics and minimum safe altitudes and further due to his performing aerobatics at an altitude of less than 1,000 feet, all of which are excluded from coverage under defendant's policy."

The policy expressly provides that it "does not apply * * * to any insured:

   *    *    *    *    *    *

"(b) who violates or permits the violation of any governmental regulations for civil aviation applying to aerobatics, instrument flying, minimum safe altitudes, repairs or alterations;

"(c) who permits, performs or attempts to perform aerobatics during which the aircraft is intentionally operated at an altitude of less than 1,000 feet above the terrain * * *."

The Civil Air Regulations provide:

"43:48 Aerobatic flight. No pilot shall intentionally fly an aircraft in aerobatic flight carrying passengers unless all of the occupants are equipped with approved parachutes."

The Minnesota State regulations provide prohibitions against the following:

"60.102 Careless or Reckless Operation. No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

"Note: Examples of aircraft operation which may endanger the lives or property of others are:

"a. Any person who 'buzzes', dives on, or flies in close proximity to a farm, home, any structure, vehicle, vessel, or group of persons on the ground. * * * A pilot who engages in careless or reckless flying and who does not own the aircraft which he is flying unduly endangers the aircraft, the property of another.

"b. The operation of aircraft at an insufficient altitude endangers persons or property on the surface or passengers within the aircraft. Such flight may also constitute a violation of 60.107.

" 60.106 Acrobatic Flight. No person shall engage in acrobatic flight:

"d. Below an altitude of 1,500 feet above the surface.

"60.107 Minimum Safe Altitudes. Except when necessary for take off or landing, no person shall operate an aircraft below the following altitudes:

"a. Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface."

### Definitions.

"15.1 Acrobatic Flight. Maneuvers intentionally performed by an aircraft involving an abrupt change in its attitude, an abnormal attitude, or an abnormal acceleration."

The Minnesota law provides, M.S.A. § 360.075: that it is a misdemeanor to "engage in acrobatic or stunt flying without being equipped with a parachute and without providing any other occupants of the aircraft with parachutes and requiring that they be worn; * * *."

The undisputed evidence is as follows. There were no parachutes in this plane.

The plane, from a level flight of more than a quarter of a mile high, dived close to the ground. (See testimony of Ernest Meyer, footnote 4.) This testimony, by Mr. Meyer, covers the two successive dives. He testifies: "I kept the plane in constant view from the time I first saw it until it crashed". The two other eyewitnesses had their attention drawn to the plane when it was flying level shortly before it made the second dive, which each of them saw. Each of the three witnesses saw the plane either strike or disappear just before striking the trees.

The testimony of each of these three as to operation of the plane engine is as follows. Mr. Meyer saw the plane flying level at about three quarters of a mile high; then dive to very near the ground; then sweep back up to about the former altitude and level off; then dive again. The further down it went in the second dive the faster. It crashed about a mile from him. He noticed "black or bluish black" smoke or dust from the rear of the plane when it started to rise from the first dive. Both dives were at a 45 degree angle. The last dive was faster. He did not hear the plane engine "as I had the motor of my car running", which "made much noise." Mr. Latusick testified he saw the plane flying "straight ahead" then it made a dive at a 45 degree angle. The engine was "roaring". The plane disappeared just before it hit the trees. He did not hear the engine "during the interval of the few seconds between the time the plane disappeared and the time I heard the crash". He was standing about three quarters of a mile from the place of the crash. Mr. Brandt was standing about one and one quarter miles from the place of the accident. From a level course northward "it made a left turn toward the west and then came back south and made a dive. * * I heard the motor during all the time that I saw it. * * * It roared all the way down."

In addition to this eyewitness testimony there is the physical evidence that the impact of the engine with a twelve inch diameter oak tree was so terrific that it carried the tree fifty to seventy-five feet and then rolled forty feet beyond before stopping.

Also, there is the expert opinion of Mr. Lowe that the power was operating when the engine struck the tree tops.

Considering all of the above testimony we are convinced that it shows clearly that the plane was being operated by Nielsen in violation of governmental regulations and the Minnesota law by intentional flying in aerobatic flight carrying passengers when none of the occupants were equipped with parachutes and in violating the Minnesota law by engaging in aerobatics below the lawful prescribed minimum altitudes. Such activity of Nielsen was clearly within the express exclusions of the policy. Therefore, the Court erred in his Finding that the appellant had failed in sustaining its burden of proof that Nielsen had acted within the exclusions of the policy.

Unless appellant is estopped to claim the protection of the exclusion provision of the policy, the Judgment must be reversed. Appellee urges such estoppel. The claimed pertinent factual situation is that it was the legal duty of appellant to investigate this accident; to inform appellee of the existence of the omnibus provision of the policy; and to assume the defense of the suits against Nielsen. Appellant did not so inform appellee until during the trial of those suits and, thereupon being tendered such defense, refused. Appellant had made an investigation of the accident and, being convinced therefrom that Nielsen had deliberately indulged in aerobatics, had not taken the matter up with appellee but had assumed defense of Lowe in these passenger cases. The position of the appellant is that, because of the exclusion provisions of the policy, it was under no duty to assume such defense.

The duty of an insurer to defend suits brought against the insured depends upon an obligation so to do created by the policy contract. We have not, in this record, the provision in this policy covering this obligation. However, it seems

conceded that there was such a provision since appellant raises no point as to the particular wording thereof but relies solely upon the situation that the accident occurred while Nielsen was engaged in activities within the exclusion provisions of the policy. This case was tried and determined upon that basis and we so treat it here.

■ Determination depends upon the law of Minnesota. It seems clear that where an insurer, with full knowledge of the facts concerning such coverage, *assumes* defense of an action against the insured, without an agreed upon reservation of its rights to contest coverage with the insured, it may be estopped to challenge that coverage thereafter.[7] However, the converse situation where the insurer refuses and will not accept such defense does not, of itself, create a situation ripe for an estoppel of it to deny liability to the insured for a policy excluded risk. The Minnesota law is that where the insured is sued and his acts are not within the policy coverage, the insurer is not obligated to assume the defense.[8] Since the situation here is that the insurer did so refuse because it deemed this insured was acting within a policy exclusion of coverage and the insurer has established that to be true, it was under no contract obligation to assume defense of the suits against the insured. Therefore, no estoppel for refusal so to do is here present.

To allow an estoppel would be to create a legal absurdity. This would arise from the situation following: under Minnesota law, the insurer with full knowledge of the fact situation as to coverage would be estopped to question such coverage if it assumed defense of the passenger suits against Nielsen; whereas the insurer is faced with a like estoppel if it refuses so to defend where it relies upon policy coverage exclusions and proves factual application of such exclusions. The Minnesota law does not thus blow hot and cold. Of course, if the insurer fails to prove the occurrence to be within the policy exclusion, it would have to respond in damages to the insured for its failure to perform its contract obligation to defend.

■ The plea, in the reply, that the exclusionary policy provisions involved here are "contrary to public policy and void" is directly ruled to the contrary in Giacomo v. State Farm Mutual Auto Ins. Co., 203 Minn. 185, 280 N.W. 653, 657.

Since what has been hereinbefore expressed disposes of this appeal, it is unnecessary to consider the other issues raised here by appellant. The judgment is reversed with directions to vacate the judgment and to enter judgment in favor of appellant-defendant with costs of this action.

---

7. Security Ins. Co. v. Jay, D.C.Minn., 109 F.Supp. 87, 90 (cases there cited) ; Minnesota Electric Distributing Co. v. United States Fidelity & Guarantee Co., 173 Minn. 619, 216 N.W. 784; Christian v. Royal Ins. Co., 185 Minn. 180, 240 N.W. 365.

8. Weis v. State Farm Mutual Auto Ins. Co., 242 Minn. 141, 64 N.W.2d 366;

Root Motor Co. v. Massachusetts Bonding & Ins. Co., 187 Minn. 559, 246 N.W. 118; Humphrey v. Polski (Belt Auto Indemnity Ass'n Garnishee), 161 Minn. 61, 200 N.W. 812; Security Ins. Co. v. Jay, D.C.Minn., 109 F.Supp. 87. Also see Mann v. Employers' Liability Assurance Corp., 123 Minn. 305, 143 N.W. 794.